Yosef Peretz (SBN 209288)
Emily A. Knoles (SBN 241671)
Michael D. Burstein (SBN 248516)
PERETZ & ASSOCIATES
22 Battery Street, Suite 202
San Francisco, CA 94111
Telephone:  415.732.3777
Facsimile:  415.372.3791

Attorneys for Plaintiffs
YESENIA GUITRON and JUDI KLOSEK

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YESENIA GUITRON; and JUDI KLOSEK,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.; WELLS FARGO & CO.; PAM RUBIO; and DOES 1-20,<br><br>Defendants. | Case No.  CIV-10-03461 CW<br><br>**PLANTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER**<br><br>**Date:**  January 5, 2012<br>**Time:**  2:00 p.m.<br>**Place:**  Courtroom 2<br>**Judge:**  Honorable Claudia Wilken |

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................- 1 -

II.   FACTUAL BACKGROUND.....................................................................................- 1 -

   A.   The Sales Program at Wells Fargo..................................................................- 1 -

   B.   To Meet Wells Fargo's Unreasonable Expectations Rubio Ran the St. Helena Branch in a Harassing and Discriminatory Manner ........................................................- 4 -

   C.   Plaintiffs Witnessed and Reported Unlawful Activities ................................- 6 -

   D.   Plaintiffs Were Retaliated Against For Making Complaints .........................- 6 -

III.  RELEVANT PROCEDURAL HISTORY ................................................................- 8 -

   A.   Legal Standard for Joining Claims ................................................................- 9 -

   B.   Plaintiffs' Claims Arise Out of the Same Transaction or Occurrence............- 9 -

   C.   Defendants Fail to Show the Plaintiffs' Claims are Distinct and Separable................- 11 -

   D.   Plaintiffs' Claims Arise From Common Questions of Law and Facts .........- 14 -

   E.   This Court Should Not Sever Plaintiffs' Claims Because There is No Danger of Either Confusion or Prejudice .........................................................................- 14 -

IV.   CONCLUSION.........................................................................................................- 15 -

# TABLE OF AUTHORITIES

**Federal Statutes**

FRCP 20 .................................................................................................................. - 1 -, - 9 -

FRCP 21 ............................................................................................................................ - 9 -

FRCP 30 .......................................................................................................................... - 15 -

**Federal Cases**

*Aikins v. St. Helena Hosp.*, 1994 WL 796604 (N.D. Cal. May 16, 1994) ........ - 10 -, - 11 -, - 12 -

*Bautista v. Los Angeles County* (9th Cir. 2000) 216 F.3d 837 .............................................. - 13 -

*Beckford v. Dep't of Corr., Fla.*, 2008 WL 8192939 (S.D. Fla. Apr. 29, 2008) .................... - 15 -

*Bell v. Lockheed Martin Corp.*, 2010 U.S. Dist. LEXIS 62957 (D.N.J. June 23, 2010) ........ - 13 -

*Brown v. Washington Steel* (S.D. Ohio 2002) 211 F.R.D. 320 .............................................. - 13 -

*Coleman v. Quaker Oats Co.* (9th Cir. 2000) 232 F.3d 1271 ................................................ - 14 -

*Coughlin v. Rogers* (9th Cir. 1997) 130 F.3d 1348 ............................................................... - 15 -

*Franklin Fueling Sys. v. Veeder-Root Co.*, 2009 U.S. Dist. LEXIS 107507
    (E.D. Cal. Nov. 17, 2009) .................................................................................................. - 9 -

*Gammons v. Real Property Inv. Servs., Inc.*, 2010 U.S. Dist. LEXIS 139930
    (D. Ariz. Aug. 9, 2001) .......................................................................................... - 14 -, - 15 -

*Grayson v. K-mart Corp.* (N.D. Ga. 1994) 849 F.Supp. 785 ................................................ - 13 -

*League to Save Tahoe v. Tahoe Reg'l Planning Agency* (9th Cir. 1977) 558 F.2d 914 .......... - 10 -

*Montgomery v. STG Int'l, Inc.* (D.D.C. 2008) 532 F.Supp.2d 29 ....................... - 9 -, - 10 -, - 12 -

*Mosley v. Gen. Motors Corp.* (8th Cir. 1974) 497 F.2d 1330 ............................................ passim

*Mosley v. Gen. Motors Corp.* (E.D. Mo. 1973) 63 F.R.D. 127 ..................................... - 9 -, - 10 -

*Smith v. North Am. Rockwell Corp.* (N.D. Okla. 1970) 50 F.R.D. 515 ................................ - 13 -

*Stone Age Foods v. Exchange Bank* 1997 U.S. Dist. LEXIS 4641 (N.D. Cal. Mar. 4, 1997) .- 9 -

*United Mine Workers of Am. v. Gibbs* (1966) 383 U.S. 715 ................................................... - 9 -

*United States v. Mississippi* (1965) 380 U.S. 128 ................................................................ - 10 -

*United States v. Whitworth* (9th Cir. 1988) 856 F.2d 1268 .................................................. - 14 -

I.   **INTRODUCTION**

Plaintiffs YESENIA GUITRON ("Guitron") and JUDI KLOSEK ("Klosek") (collectively, "Plaintiffs") were employed at the St. Helena Branch (the "Branch") of Defendants WELLS FARGO N.A. and WELLS FARGO & CO. (collectively, "Wells Fargo") during 2008-2010, and were pressured by the Branch's manager, Defendant PAM RUBIO ("Rubio"), to implement unlawful and unethical business practices.  Rubio implemented these practices so she could meet her sales goals and, in particular, the strict and highly unreasonable daily quota for selling banking products referred to as "Daily Solutions."  Wells Fargo's sales policies provide financial incentives to bankers for meeting Daily Solutions quotas and punished them for not meeting minimum sales goals.  Rubio engaged in two discreet sets of unlawful behavior to increase the Daily Solutions level at the Branch.  First, she encouraged employees and managers to fraudulently and artificially inflate sale activity by opening accounts and sign up customers for banking services without the customers' knowledge or consent or by simply forging bank records.  Second, in an effort to leverage the old adage that "sex sells," Rubio openly harassed older and disabled employees while pressuring young female bankers to use sex appeal to sell banking products.

Both Plaintiffs persevered through this harsh environment at the Branch and repeatedly complained progressively further up the Wells Fargo management hierarchy to no avail, as Rubio, the regional senior management team and Human Resources personnel ignored their complaints and subjected Plaintiffs to retaliatory treatment that resulted in their termination.

Federal Rules of Civil Procedure ("FRCP"), Rule 20(a)(1), permits joinder of claims if they arise from the same transaction or occurrence and if the claim involves a common question of law or fact.  Joinder of Plaintiffs' claims in this case is both proper and permissible under FRCP 20 because Plaintiffs' claims arise from Defendants' implementation of the same sales policies, at the same branch, by the same management team and during the same period of time.  Similarly, both Plaintiffs complained about similar unlawful, retaliatory and discriminatory conduct.  As such, Defendants' Motion to Sever should be denied.

II.   **FACTUAL BACKGROUND**

   A.   **The Sales Program at Wells Fargo**

Wells Fargo provides financial-based incentives to its employees to induce and enhance banking activity by customers and potential customers.  The employee incentive plan is divided

into 5 categories, as follows: a) Daily Solutions; b) Profit Proxy for specific banking products; c) Package Penetration; d) Partner Referrals; and e) Loan Units. In order to qualify for an incentive payout paid to the banker at the end of each quarter, the banker must meet 100% in 4 of the 5 above categories. [Plaintiffs' Index of Evidence and Evidence in Support of Oppositions to Motion for Summary Judgment and Motion to Sever ("PE") 12, 76:25-80:20, 82:25-85:13] The Daily Solutions is the most dominant part of Wells Fargo's incentive program for the purposes of payment. [*Id*.] According to this program, Personal Bankers Grade I ("PB1") and Personal Bankers Grade II ("PB2"), at Wells Fargo, which Guitron and Klosek respectively were, are expected to induce customers to open additional or new accounts, as well as to accept other financials products and services such as ATM cards, credit cards, checks, saving accounts and brokerage accounts.[1] [*Id*.] New or additional financial product that a Personal Banker sells is counted by Wells Fargo as a Daily Solution. [*Id*.] The various financial products have a different "value" of Daily Solutions that is based on its internal value to Wells Fargo that is derived from the potential profitability of the product. [*Id.*]

Wells Fargo awards bonuses to its employees under the Daily Solutions program based on the performance of the individual banker, the branch performance and the performance of Wells Fargo at the region level. [PE 12, 93:14-97:13; PE 38.] Wells Fargo also obligates all Personal Bankers to secure a quarterly quota of Daily Solutions, which was minimum average of 8 Daily Solutions per day in 2008 and 2009 and 8.5 per day in 2010. [PE 12, 80:11-82:23; PE 13 111:12-19.] If a Personal Banker fails to meet his or her quota, disciplinary measures could be taken against that banker, but if a Personal Banker meets the Daily Solutions quota, he or she receives bonus compensation. [PE 12, 77:5-79:5; PE 2, ¶ 9; PE 39; PE 3, ¶ 4; PE 4, ¶ 7; PE 3, ¶ 59; PE 40.]

Goals for each banker are set and then measured each quarter. [PE 4, ¶ 7.] Employees who meet or exceed these goals are rewarded with additional compensation; those who fell short were reprimanded, leading to possible termination. [PE 4, ¶7.] As such, management pressured employees to meet their quotas, and employees were eager to achieve their individual goals in order to earn incentive compensation as well as keep their jobs. [PE 4, ¶ 8.] Similarly, Wells Fargo branch and regional managers have Daily Solutions quotas insofar as they are

---

[1] PB1 and PB2 were similar positions and *not* significantly different in their day to day duties. [PE 12, 77:5-79:5; PE 2, ¶ 9; PE 3, ¶4; PE 4, ¶ 7, PE 39.] Rubio would regularly interchange the positional obligations by giving high value clients to PB1 instead of PB2. [PE 6, ¶ 7.]

responsible for ensuring their employees' meet or exceed their quotas. Like Personal Bankers, branch and regional managers can either earn bonuses by meeting or exceeding the quotas and will be subjected to disciplinary actions should they fail to do so. [PE 12, 20:10-25.]

Rubio is, and at all relevant times was, primarily responsible for implementing the sales policies and incentive plans at the St. Helena Branch. [PE 1, ¶ 3; PE 41.] As part of her duties, Rubio has the discretion in deciding which Personal Bankers receive any referrals for prospective new or existing customers. Rubio had significant control over her employees' ability to reach or exceed the quota of Daily Solutions, as well as the ability to withhold referrals, and thus ensure persistent under-performance for certain Personal Bankers. [PE 5, ¶¶ 10-11; PE 6, ¶ 5; PE 14, 209:7-218:14; PE 42.]

The Daily Solutions goals are set to conform to regional or national standards that *do not* take into account local market conditions, including size of local population, income levels, rate of growth in target customer population, degree of banking product penetration, competition, store numbers and location, which factors can greatly affect the likelihood of success in generating additional business for individual bankers.[2] [PE 4, ¶ 9.] St. Helena Branch, for example, had to compete against *eleven* other financial institutions for customers in an area where only approximately 11,500 potential customers reside, and its bankers were bound to secure a quota of almost 12,00 Daily Solutions each year as well as an average of almost 3,000 new checking accounts a year. [PE 12, 55:22-57:25, 59:14-60:24; PE 4, ¶ 10-12.] It was thus impossible for the Personal Banker at the Branch to meet their goals each day without engaging in unlawful practices. [PE 4, ¶ 11.] Certain team members at the Branch resorted to cheating, or "gaming" the sales system to win credits to meet their goals.[3] However, as provided by Dr. Richard George ("George"), a commercial banking industry expert, "by setting unreasonable goals, Defendants created a situation that led certain employees to commit dishonest and illegal acts." George further opines that "by not adjusting these goals to lessen the pressure on

---

[2] Other employees at branches around the country were held to the same level of unreasonable expectations and suffered from the same problem of inability to achieve these goals without cheating. [PE 7, ¶¶ 7-12; PE 8, ¶¶ 6-10.]

[3] "Gaming", as defined in Wells Fargo Code of Ethics, is one type of violation of the Wells Fargo's sales integrity policies, which violations "involve the manipulation and/or misrepresentation of sales or referrals and reporting of sales and referrals in an attempt to receive compensation or to meet sales goals. Unethical sales behavior has far reaching impacts. It impacts customer relationships, damages relationships between Team Members, and leads to loss of revenue and reputation for the company". [PE 3, ¶ 3 PE 43, at WFB 135).]

employees to resort to unethical acts, Defendants acted irresponsibly."[4] [PE 4, ¶ 20.]

### B. To Meet Wells Fargo's Unreasonable Expectations Rubio Ran the St. Helena Branch in a Harassing and Discriminatory Manner

As set forth above, Rubio, who ran the Branch from 2002 until after this lawsuit was filed in 2010, was charged with ensuring that the team members at St. Helena met their Daily Solution goals. [PE 12, 16:1-7, 31:20-22; PE 1, ¶ 3; PE 41.] Plaintiffs were both employed at the Branch during the relevant time period. Specifically, Guitron was employed at the Branch beginning in August 2008 and continuing through January 2010. Klosek was transferred to the Branch in June 2009 and continued to be actively employed there until May 2010. [PE 21, 283:6; PE 3, ¶ 15; PE 202.] During this time, Rubio and Wells Fargo placed a lot of pressure on their bankers to get sales "at any cost". [PE 9, ¶ 6; P ¶ 5; PE 17, 314:15-21; PE 6, ¶5 .] For example, the pressure at the St. Helena Branch to achieve sales goals was so high that management would conduct *hourly* checkups to see whether Daily Solutions were being achieved. [PE 17, 317:1-21.] Furthermore, in September 2009, while both Plaintiffs were at the Branch, Rubio implemented policies in an effort to increase daily sales that far exceeded, and thus were inconsistent, with the scope of Wells Fargo's formal written policies, by mandating that unless the personal bankers met their average required minimum sales goals on a *weekly* basis, they would not be eligible for promotions. [PE 16, 73:22-75:15; PE 45.] Such a requirement far exceeds the general requirements of Wells Fargo, which only requires that you meet your average sales goals on a *quarterly* basis and did not automatically subjected the banker to discipline or the denial of work benefits and privileges.[5] To that end, Rubio's own bonuses were based on the achievement of sales goals by her staff, Rubio's sales targets did not change if any of her staff was unavailable for some reason, even for a medical leave. [PE 12, 99:11-100:17, PE 3, ¶ 8.]

---

[4] Rather than enforce Wells Fargo's internal anti-gaming practices and raise awareness to the severity of those practices, Wells Fargo created and distributed a memorandum entitled "Mistakes to Avoid". However, each of the alleged "mistakes" was in fact unethical, fraudulent or even criminal conduct. Nonetheless, the regional Vice President, Greg Morgan ("Morgan") simply disregards the difference and the impact of intentional wrongful conduct by calling such conduct a "mistake." [PE 15, 158:5-178:12; PE 44.]

[5] Furthermore, Wells Fargo policies specify that sales goals only account for 50% of the basis for a quarterly review, even if an employee failed to meet the minimum sales goals, they could still be eligible for promotion. [PE 2, ¶ 59; PE 40.] Thus, the policy implemented at the St. Helena Branch increased the obligations of the Personal Bankers and created additional punishments. [PE 16, 73:22-75:15; PE 45.]

In order to ensure that she received her quarterly bonus, Rubio set forth these and other aggressive and harsh sales and discipline policies, which resulted in the harassment and discrimination of Plaintiffs. Specifically, Rubio encouraged younger women who worked at the Branch, including Guitron, to use their "physical assets" to garner sales. [PE 18 127:4-13, 128:18-129 (told on a weekly basis by Rubio to unbutton her shirt a little to "get more sales"); PE 19 87:7-88:23 (told her to dress provocatively to get more sales.); PE 6, ¶5(f).] Guitron, who is a young, single mother of two, was told to "shake her skirt" and bring her boyfriends in for sales. [PE 22, 333:9-334:1.] Guitron refused to engage in these practices and was offended by them.[6] [PE 2, ¶ 6.]

While all these individuals could be viewed as young women, Klosek, who was the oldest banker at the Branch at 63, older than the next oldest banker by almost 20 years and older by 30-40 years over all other bankers and tellers, was told by Rubio that she was too old to be in the banking industry. [PE 23, 168:7-169:1; PE 37.] Rubio further made remarks to Klosek questioning her retirement and encouraging her to read a book entitled "Bridging the Age Generation Gap".[7] [Id. at 80:5-8, 181:3-12, 233:9-234:4, 237:22-238:8.]

As such, it is clear, that Guitron and Klosek were affected by the same Wells Fargo policies enforced by Rubio at the Branch which were premised on the use of the sexuality of the female bankers to aggressively secure sales. In furtherance of this policy, Rubio refused to assist Klosek by not providing her with referrals and other means of support and instead gave her support to younger women who were willing to use their sexuality to garner more sales. [PE 18, 127:4-13, 128:18-129:9; PE 19, 87:7-88:23; PE 23, 207:1-24.]

Additionally, both Plaintiffs were affected by Rubio's harassing and discriminatory policies by being marginalized on account of their protected statuses, namely for being older

---

[6] Alternatively, Mary Crisp ("Crisp"), a Personal Banker at the Branch, was noted to regularly dress provocatively and she was promoted by Rubio to Assistant Manager at the Branch. [PE 17, 181:15-182:8; PE 20, 149: 20-23; PE 47 at WFB 3994.]

[7] Similarly, while Klosek was at the Sonoma Branch in early 2009, her then supervisor, John Alejo referenced that Klosek resembled a "Wal-Mart greeter", told her that she did not fit in with the young banking staff, refused to assist her and instead focused his attention on assisting younger bankers. [PE 23, 239:6-240:4.] The Sonoma Branch was managed by the same District Manager, Hale Walker ("Walker") as the Branch and was part of the same region overseen by Morgan. [PE 25, 22:20-23:6.] Alejo's conduct was harassing and in furtherance of the same company policy which required the managers to enforce impossible sales expectations. [PE 4, ¶ 20.]

and for being a single woman and parent. Their protected statuses required Plaintiffs to take various leaves of absences and/or seek schedule accommodations. However, Plaintiffs were considered to have failed to meet their targets and were subjected to negative performance reviews because Wells Fargo's policies and Rubio's implementation thereof require the Branch sales goals to be met when employees were on leave under protected absences. [PE 12, 99:11-100:17; PE 22, 368:23-369:14; PE 34; PE 49-57; PE 24, 537:22-538:10; PE 61-62.][8]

Both Plaintiffs made complaints about Rubio and Branch management's refusal to accommodate their requests and their discriminatory and harassing policies. [PE 2, ¶ 7; PE 60; PE 3, ¶ 8.] Despite these complaints, Wells Fargo failed to take any steps to investigate these concerns. [PE 2, ¶ 2; PE 60; PE 3, ¶ 8.]

### C. Plaintiffs Witnessed and Reported Unlawful Activities

The pressure by Rubio and Wells Fargo as a result of Wells Fargo's unreasonable sales expectations resulted in unlawful and fraudulent bank practices by Personal Bankers at the Branch. Plaintiffs and other bankers regularly made complaints and raised concerns about the unethical conduct of other bankers used to achieve sales goals. [PE 5, ¶¶3-10; PE 6,. ¶¶5-6; Mendez Decl. ¶¶8-13; PE 21-22 69:7-15, 141:19-142:10, 154:6-155:25, 166:5-167:18,172:4-173:9, 197:23-198:21; PE 24, 370:20-376:3; 385:2-387:18; PE 35; PE 63; PE 2, ¶ 23; PE 64; PE 65; PE 35; PE 66; PE 36; PE 67-69; PE 26, 52:16-53:25; PE 70; PE 3, ¶ 21; PE 71.] Throughout their employment, but most aggressively beginning in August 2009 and continuing through the fall and winter of 2009, Plaintiffs made numerous complaints about the unethical, unlawful and fraudulent practices at the Branch.[9] In addition to making complaints, Plaintiffs refused to participate in the unlawful and fraudulent practices occurring at the St. Helena Branch with regard to gaming and as such had difficulty making their own incentive goals. [PE 4, ¶¶ 10-12; PE 3, ¶ 10; PE 2, ¶ 20.]

### D. Plaintiffs Were Retaliated Against For Making Complaints

The higher up the Wells Fargo management chain and the more frequently Guitron complained, the more the more aggressively Defendants retaliated against her. Rather than

---

[8] Klosek was on a medical leave of absence in the 4th Quarter of 2008 and the 1st Quarter of 2009 and was written up by Alejo for failing to achieve her sales goals during that time. [PE 24, 471:11-22, 537:22-538:10; PE 61-62.]

[9] A thorough analysis of Plaintiffs' complaints are included in the Plaintiffs Index of Exhibits and set forth in the Opposition to Motion for Summary Judgment.

respond to Guitron's complaints by disciplining the bankers gaming the system, beginning in August 2009, Defendants engaged in a retaliatory campaign, including but not limiting to:

    1)  manufacturing false reports of Guitron's misconduct;  [PE 12, 257:2-13, 186:9-15, 194:18-25, 209:6-2; PE 89-92; PE 66; PE 2, ¶ 12.];

    2)  drafting unfair and unsupported poor performance reviews that were not reflective of Guitron's actual work product; [PE 3, 368:23-369:14; PE 34; PE 49-57.];

    3)  placing Guitron on an informal warning and drafting a formal warning for Guitron's failure to achieve sales goals even though such warnings were not common practice at the Branch; [PE 3, 245:25-246:8; PE 6, ¶5(g); PE 17, 337:20-339:22; PE 25, 156:16-157:6; PE 87; PE 12, 257:2-25; PE 88.];

    4)  filing false complaints with the Ethics Hotline about Guitron and vigorously investigating Guitron for misconduct; [PE 12, 241:2-14; PE 29; 181:12-2; PE 26, 74:9-19, 98:24-99:8, 90:22-91:18, 109:4-15, 109:4-110:11, 119:7-18, 120:18-121:3; PE 97-105.];

    5)  refusing to allow Guitron to apply for a promotion; [PE 2, ¶ 36; PE 110; PE 2 ¶ 36; PE 110; and

    6)  terminating Guitron. [PE 22, 507:9-514:15.; PE 2, ¶ 57.]

Similarly, Klosek was harassed and retaliated against by Defendants after making complaints at the St. Helena Branch, as well as at her previous Wells Fargo location in Sonoma. Beginning in the fall of 2009, Defendants engaged in a retaliatory campaign against Klosek, including but not limiting to:

    1) drafting inaccurate and unfair performance reviews; [PE 24, 471:10-472:11; PE 61; PE 24, 378:5-379:25, 381:14-382:8];

    2) making false claims that Klosek had acted improperly and investigating her; [(PE 3, ¶ 24; PE 118; PE 26, 114:21-119:5; PE 103;

    3) preparing informal warnings for Klosek for conduct she did not engage in or for which others were not punished; [PE 25, 172:24-179:8; PE 119; PE 29, 219:9-220:22; PE 129; PE 24, 490:23-498:15, 495:24-496:7.];

    4) placing Klosek on administrative leave as a punitive measure;  [PE 25, 112:20-114:1; PE 20, 45:2-22.]; and

PLANTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER
- 7 -

5) terminating Klosek and not allowing her to return to work after she recovered from cancer.[10] [PE 3, ¶¶ 41-42.]

At the time Plaintiffs were retaliated against by Defendants, Rubio and the rest of Wells Fargo's management team viewed Plaintiffs as a collective unit that disrupted the order of things by questioning the illegal practices at the Branch. [PE 20 111:1-8; PE 125 (Irene Perez stated that Plaintiffs were spoken to differently than other team members); 139:4-20; PE 47 (Ventura Aliva stated that store management gave Plaintiffs a hard time); 151:25-152:6; PE 135 (Kelly Belgin stated that Plaintiffs spoke up and are no longer at the Branch)]. For example in a September 15, 2009, email from Rubio to Diane Brandenburg ("Brandenburg"), Human Resources Consultant, and Hale Walker ("Walker"), District Manager, Rubio stated that it was probably a mistake to allow Plaintiffs to sit together at a meeting. [PE 12, 220:11-23; PE 86]. Thereafter, in or around December 2009, Rubio, Walker, Brandenburg and Susan Eagle-Williams, the then Human Resources Manager for the Northern California Region, specifically held a meeting to that treated Plaintiffs a pair in terms of determining how to respond to their complaints. [PE 12, 324:3-325:5; PE 86].

### III. RELEVANT PROCEDURAL HISTORY

Defendants' Initial Disclosures, served on Plaintiffs on February 22, 2011, identified 12 witnesses, each of whom pertained to both Plaintiffs. [PE 1, ¶6; PE 143.] On March 23, 2011, Plaintiffs' Amended Initial Disclosures were served on Defendants, wherein Plaintiffs identified 42 witnesses in their disclosures, 31 of whom have relevant testimony for both Plaintiffs. [PE 1, ¶7; PE 144.] Plaintiffs have designated 3 retained experts: an economist, a psychiatrist and an expert of banking policies and procedures whom all have relevant expert testimony pertaining to both Plaintiffs. [Peretz Dec, ¶9.]

Fact discovery commenced on January 18, 2011, and ended on October 5, 2011. [Docket Nos. 18 & 33.] Plaintiffs' rights to discovery under the FRCP were based on the premise that they brought one single action, which meant that Plaintiffs were limited to only 10 depositions. By stipulation, the parties agreed on March 16, 2010, each side will be allowed to take two extra days of deposition. [PE 1, ¶10.] The parties ultimately took depositions of 22

---

[10] A thorough analysis of the retaliation and harassment Plaintiffs suffered is included in the Plaintiffs Index of Exhibits and the Opposition to the Motion for Summary Adjudication.

non-expert deponents, and out of those, 19 deponents provided testimony pertinent to both Plaintiffs. [PE 1, ¶12.]

## IV.  LEGAL ANALYSIS

### A.  Legal Standard for Joining Claims

FRCP 20(a)(1) enables plaintiffs to join together in one action if (1) a claim arises from the same transaction, occurrence, or series thereof; and (2) the claim involves a common question of law or fact.  Although there is no bright-line definition of "transaction" or "occurrence," courts routinely hold that, "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Mosley v. Gen. Motors Corp.* (8th Cir. 1974) 497 F.2d 1330, 1333 ("*Mosley II*") at 1333.  The application of this test is "to be construed liberally" because it promotes judicial economy, expedites the final determination of disputes, and prevents multiple lawsuits. *United Mine Workers of Am. v. Gibbs* (1966) 383 U.S. 715, 724 ("the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.").

In employment disputes, a "systematic pattern or practice" that causes injury satisfies the same transaction or occurrence requirement under FRCP 20. *Montgomery v. STG Int'l, Inc.* (D.D.C. 2008) 532 F.Supp.2d 29, 35 ("*Montgomery*"); *Stone Age Foods v. Exchange Bank* 1997 U.S. Dist. LEXIS 4641(N.D. Cal. Mar. 4, 1997) (employee-plaintiff must show "some systematic pattern or logical relationship connecting the tortious conduct of each defendant.") (internal citations omitted).  To guard against misjoinder, FRCP 21 gives courts the discretion to sever claims or parties when justice so requires.  Courts disfavor motions to sever and place a high burden on the moving party to show "significant prejudice absent severance of the claim," and that the issues to be severed "are truly distinct and separable." *Franklin Fueling Sys. v. Veeder-Root Co,* 2009 U.S. Dist. LEXIS 107507 (E.D. Cal. Nov. 17, 2009).

### B.  Plaintiffs' Claims Arise Out of the Same Transaction or Occurrence

With respect to claims arising from employment disputes, *Mosley II* is on point as ten plaintiffs brought suit alleging racial and/or gender discrimination.  *Id*. at 1331; *Mosley v. Gen. Motors Corp*. (E.D. Mo. 1973) 63 F.R.D. 127, 128-29 ("*Mosley I*") *aff'd in part, rev'd in part*, 497 F.2d 1330 (8th Cir. 1974).  These ten plaintiffs brought claims against two different

divisions of General Motors and suffered different forms of retaliation.[11] In ruling that the plaintiffs were properly joined, *Mosley II* relied heavily upon the Supreme Court's decision in *United States v. Mississippi* (1965) 380 U.S. 128, wherein the United States brought suit against the State of Mississippi, the election commissioners, and six voting registrars of the State, alleging that they "had acted and were continuing to act as part of a state wide system designed to enforce the registration laws in a way that would inevitably deprive colored people of the right to vote solely because of their color." *Mississippi* at 142-143.  Despite the individualized evidence arising from the specific acts of vote suppression, the Supreme Court found the allegation to be a sufficient transaction or occurrence under FRCP 20 for joinder. *Id*. In light of that ruling, the *Mosley II* court found a "company-wide policy" of discrimination constitutes a "transaction or occurrence" under FRCP 20 if each plaintiff had been injured by the "same general policy."

The Ninth Circuit approved of *Mosley II*'s logic in *League to Save Tahoe v. Tahoe Reg'l Planning Agency* (9th Cir. 1977) 558 F.2d 914, 917, when it found that the four named defendants had been properly joined under FRCP 20. *See also Aikins v. St. Helena Hosp,* 1994 WL 796604 (N.D. Cal. May 16, 1994) ("*Mosley* is persuasive…[a]pplying *Mosley*, plaintiffs' claims arise out of the same series of transactions or occurrences"). Similarly, the *Montgomery* court decided that a joinder was appropriate for two plaintiffs who worked in separate departments in different locations, under different supervisors, who were terminated on different days, and who alleged different claims against their former employer. *Id*. at *30. Despite these differences, the court found sufficient commonality on the allegation that both plaintiffs suffered adverse actions after having raised concerns over the defendant's improper financial and business practices. *Id*. at *36.

Like *Mosley* and *Montgomery,* there are common factors that gave birth to Plaintiffs' action. First, the company-wide sales policy placed unreasonable pressure on bankers to sell large numbers of banking products in the small and competitive St. Helena market. [PE 4, ¶¶9-12; PE 12, 55:22-57:25, 59:14-60:24.] Second, Rubio condoned illegal sale practices and created a hostile work environment by objectifying salespersons to be young and attractive so

---

[11] Eight plaintiffs brought claims against the Chevrolet Division and the remaining two against the Fisher Body Division. *Mosley II* at 1331. Only five of the plaintiffs in the Chevrolet Division and one plaintiff in the Fisher Body Division alleged that they had been discharged for complaining and protesting about racially discriminatory practices. *Mosley I at* 129.

Rubio could meet her goals. [PE 16, 73:22-75:15; PE 45.] Thus, Rubio pressured Guitron to "shake her skirt" and wear immodest clothing, and Klosek suffered ageist comments and was denied referrals. [*See e.g.* PE 18, 127:4-13, 128:18-129; PE 19, 87:7-88:23; PE 6, ¶5(f); PE 22, 333:9-334:1; PE 17, 181:15-182:8; PE 20, 149: 20-23; PE 47 at 3994; PE 23, 80:5-8, 168:7-169:1, 181:3-12, 207:1-24, 233:9-234:4, 237:22-238:8; PE 33 at 4.] Third, Plaintiffs refused to engage and subsequently complained about the pervasive illegal and unethical conduct at the Branch. [*See e.g.* PE 5, ¶¶3-10; PE 6, ¶¶5-6; PE 10, ¶¶8-13; PE 21, 69:7-15, 141:19-142:10, 154:6-155:25, 166:5-167:18,172:4-173:9, 197:23-198:21; PE 24, 370:20-376:3; 385:2-387:18; PE 35; PE 63; PE 2, ¶25; PE 64; PE 2, ¶35; PE 65; PE 63; PE 66; PE 36; PE 67-69; PE 26, 52:16-53:25; PE 70; PE 3, ¶24; PE 71.] Fourth, Defendants retaliated against Plaintiffs for complaining through manufacturing complaints, sham investigations and baseless negative performance reviews. [*See e.g.* PE 12, 99:11-100:17; PE 22, 368:23-369:14; PE 34; PE 49-57; PE 24, 537:22-538:10; PE 61-62.] In sum, Plaintiffs would not have brought their claims had it not been for the unreasonable sales goals and unlawful sales practices of Defendants.

Similar to *Mosley*, *Montgomery* and the case at bar, a common factor — a policy of not providing an interpreter to deaf individuals — was the basis for the court in *Aikins v. St. Helena Hosp*. 1994 WL 796604 (N.D. Cal. May 16, 1994), to maintain a joinder of otherwise two distinct plaintiffs under the Americans with Disabilities Act. Akins who is deaf alleged that a hospital and a treating physician failed to communicate with her during her late husband's treatment. *Id*. at *1. The joinder plaintiff, Caloroso, Jr. who was also deaf, alleged that he was forced to rely on his eight year old daughter to interpret for him when he underwent treatment at the hospital because the hospital had failed to provide any other options. *Id*. at *1. The *Aikins* court stated that although the factual basis for plaintiffs' claims differed, FRCP 20 "specifically provides that a plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded." *Id*. at *2 (internal quotes and citations omitted).

### C. Defendants Fail to Show the Plaintiffs' Claims are Distinct and Separable[12]

In an attempt to portray Plaintiffs' claims as discrete occurrences, Defendants cherry-pick facts to suit their objective. First, they ignore the *raison d'etre* of Plaintiffs' claims: they

---

[12] For a full summary of the factual details of Plaintiffs refusal to engage in fraudulent behavior, the harassment, discrimination and retaliation they suffered, investigations conducted into them, the apathy with which Defendant addressed their complaints of fraud and their termination, see Section II of Plaintiffs Opposition to Defendants' Motion for Summary Adjudication.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO SEVER
- 11 -

suffered retaliation for refusing to participate in and complaining about unethical and illegal sales practices that were caused by the Daily Solutions quotas. [Second Amended Complaint, Docket No. 26, ¶¶ 2-4.] Second, even when focusing on the different discrimination claims, Defendants conveniently ignored the cause of the conduct and focused on its manifestations. Thus, Defendants ignore the pervasive principle that permissive joinder is not contingent upon causes of action or factual allegations being identical for both plaintiffs, but rather that joinder is permissible even if facts related to a common policy manifest differently between the plaintiffs. *See e.g. Mosley*, 497 F.2d at 1334; *Aikins*, WL 796604 at *2-3; *Montgomery*, 532 F.Supp. 2d at 15-16. Third, Defendants statement of facts is nothing more than a distortion of the facts of the case. For example, Defendants state that Plaintiffs occupied different job positions, held different responsibilities and worked in different locations. In reality, *the only difference* between Guitron's Personal Banker Grade I ("PB1") position and Klosek's Personal Banker Grade II ("PB2") position is that Klosek was supposed to service *high value* customers. [PE 12, 77:5-79:5; PE 2, ¶8; PE 3, ¶5; PE 4, ¶7; PE 39.] Rubio would however frequently give high value customers to younger, more attractive persons who were PB1 or allow PB2 who engaged in the unlawful gaming activities to service walk in customers that were traditionally assigned to PB1s. [PE 6, ¶7.] Also conveniently absent from Defendants' account are the facts that both Plaintiffs worked at the same branch, Rubio supervised both of them, Plaintiffs complained to the same Human Resources personnel and senior management team about the same conduct, Plaintiffs were subject to the same retaliatory conduct, and they were both ultimately terminated. [*See e.g.* PE 3, ¶14; PE 76; PE 3, ¶15; PE 77; PE 3, ¶8; PE 78; PE 24, 370:20-376:3, 385:2-387:18; PE 3, ¶ 24; PE 71, PE 22, 368:23-369:14; PE 34; PE 49-57; PE 12, 257:2-13; PE 89, 186:9-15; PE 66, 194:18-25; PE 90; 209:6-20; PE 91; PE 2, ¶ 12; PE 92.]

Defendants next contend that this court "need not examine the substance of Plaintiffs' allegations to see that joinder is improper because Plaintiffs allege different counts of claims." This approach is entirely unfounded as it directs the Court to avoid making of a *factual* inquiry into Plaintiffs' allegations to determine whether they arise from the same transaction or occurrence. *Mosley II* at 1333 ("In ascertaining whether a particular factual situation constitutes a single transaction or occurrence for purposes of Rule 20, a case by case approach is generally pursued".) Furthermore, the number of claims that each of Plaintiffs allege is not in any way dispositive of whether joinder is appropriate. *Stone Age Foods*, U.S. Dist. LEXIS 4641 at *6.

Defendants rely heavily on *Smith v. North Am. Rockwell Corp.* (N.D. Okla. 1970) 50 F.R.D. 515, 523 to claim that a company-wide discriminatory practice may not be sufficient to serve as the basis for permissive joinder. This approach has been soundly rejected post-*Mosley II*. For example, in *Bell v. Lockheed Martin Corp*, 2010 U.S. Dist. LEXIS 62957 (D.N.J. June 23, 2010), the court rejected the *Smith* rationale because *it* "was decided before *Mosley* and thus did not address the principle articulated in *Mosley* that allegations of a company-wide policy of discrimination can satisfy the 'same transaction or occurrence' prong of Rule 20(a)." *Bell* also rejected the rationale in *Martinez v. Safeway Stores, Inc,* 66 F.R.D. 446, 448-49 (N.D. Cal. 1975), another case Defendants cite to that came before the Ninth Circuit adopted Mosley's reasoning in *League to Save Tahoe*, because "*Martinez* followed the decision in *Smith* without discussion of the 'logical relationship' standard articulated in *Mosley*." *Id*. at *23. Accordingly, this Court should continue to follow *Mosley* and *League to Save Tahoe*.

Defendants also improperly rely on *Bautista v. Los Angeles County* (9th Cir. 2000) 216 F.3d 837, 840 in which the issue before the court was whether defendants' motion to dismiss the *fifty-one* plaintiffs could be sustained or if the plaintiffs had stated a claim for relief in accordance with FRCP 8. *Id*. at 839-840. The *Bautista* court was silent on the issue of joinder (as it was not presented to them), but found that each plaintiff must *state his or her claim in a separate count*, so that defendants could frame its responsive pleading. *Id.* at 841-842. Further, *Bautista* ultimately held that the district court abused its discretion when it dismissed plaintiffs' claims, and indeed, made no finding as to whether or not those claims were properly joined. *Id*. Here, the claims were stated as separate counts, and thus is in compliance with *Bautista*.

The rest of the cases that Defendants cite in support of their position are not persuasive as they involve facts that are easily distinguishable from the facts in this action. *See e.g. Grayson v. K-mart Corp.* (N.D. Ga. 1994) 849 F.Supp. 785, 788-789 (eleven individuals in four different states under different managers made a common allegation of age discrimination without alleging any coordination by defendant); *Brown v. Washington Steel* (S.D. Ohio 2002) 211 F.R.D. 320, 325 (a complaint for racial discrimination did not state when the plaintiffs worked for the employer, what departments they worked in, who the supervisor(s) was, when the adverse actions supposedly occurred, or even what position the plaintiffs held); *Gammons v. Real Property Inv. Servs, Inc,* 2010 U.S. Dist. LEXIS 139930 at *10-12 (D. Ariz. Aug. 9, 2001)

(plaintiffs did not allege a common pattern or practice, common adverse employment action or common facts supporting the claims of retaliation).

### D. Plaintiffs' Claims Arise From Common Questions of Law and Facts

While Defendants have not raised the issue as to whether Plaintiffs' claims involve a question of common law or fact, Plaintiffs note that test is easily satisfied. *Mosley*, 497 F.2d at 1333 (common question may be one of law or fact and need not be the most important or predominant issue in litigation). Here, Plaintiffs' claims raise the following common factual or legal questions: whether Defendants' sales policies had the impact alleged by Plaintiffs; if Rubio discriminated in a manner to boost sales and meet her sales quotas; whether the unlawful conduct complained about violates the Sarbanes-Oxley Act; and if Defendants retaliated against Plaintiffs for complaining about said practices.

### E. This Court Should Not Sever Plaintiffs' Claims Because There is No Danger of Either Confusion or Prejudice

Claims should only be severed if the "joinder was so manifestly prejudicial that it outweighed the dominant concern with judicial economy and compelled exercise of the court's discretion to sever." *United States v. Whitworth* (9th Cir. 1988) 856 F.2d 1268, 1277. Here, Defendants will not suffer any prejudice; while Plaintiffs would, in fact, be prejudiced should the Court sever this action.

Defendants, in relying on *Coleman v. Quaker Oats Co.* (9th Cir. 2000) 232 F.3d 1271, argue that they will be prejudiced because the testimony will be too confusing for a single jury to handle. In *Coleman*, ten plaintiffs who had worked for the defendant in six different states brought different state law discrimination claims. *Id*. at 1269. The conflicting laws and the sheer number of plaintiffs repeating similar conduct heightened the risk of confusion and prejudice. *Id*. These concerns are not present in the case at issue because there are no disparate state laws, there are only two plaintiffs who worked in same branch and under the same supervisor, and Plaintiffs suffered adverse employment actions for the same reasons.

Defendants also rely on *Gammons*, to claim that the testimony will be so inflammatory that it will prejudice any jury. *Gammons* differs from this case insofar as the plaintiffs there did not allege a common pattern and practice, adverse employment action or common facts supporting their retaliation claims. *Gammons* at *10-12. Furthermore, the *Gammons* plaintiffs alleged inflammatory racial slurs ("dark meat") and sexually explicit conduct (unconsented simulated sexual activity) that caused the court to find that "it would be difficult for the jury to

consider such behavior as separate to each Plaintiff despite a limiting instruction to do so." *Id*. at *14. Such a concern is not present here because Plaintiffs have no such graphic allegations and Plaintiffs have clearly met the common pattern and practice and common facts requirements.

In contrast, Plaintiffs will suffer prejudice if this action is severed because the discovery cutoff has passed and had Plaintiffs' claims been severed earlier, they could and would have been entitled to ten additional days of depositions under FRCP 30. [PE 1, ¶11.] If this Court severs Plaintiffs' claims, Plaintiffs will incur increased legal expenses, double expert witness fees, and an unnecessary delay in the resolution of their claims. [PE 1, ¶13.] Further, it will undermine judicial economy of this Court as Plaintiffs have identified 31 percipient and three expert witnesses who have relevant testimony for both Plaintiffs. [PE 1, ¶9, 12.] As such, it is the Plaintiffs and the Courts who will be prejudiced should this Court sever their claims and require two trials. *Coughlin v. Rogers* (9th Cir. 1997) 130 F.3d 1348, 1351 ("Rule 20 is designed to promote judicial economy, and reduce inconvenience, delay, and added expense.").

Although Defendants assert that "even the strongest jury instructions" could not cure the prejudice or confusion of a joint trial, Defendants failed to support this conclusory assertion. As an example, the court in *Beckford v. Dep't of Corr, Fla,* 2008 WL 8192939 (S.D. Fla. Apr. 29, 2008), a case with *fourteen* plaintiffs, held that "the potential for confusion will be reduced through the use of separate verdict forms and by allowing the Defendant to make separate closing arguments with respect to each Plaintiff's individual claims").

### IV.   CONCLUSION

For the above reasons, Defendants' Motion to Sever should be denied.

Dated: December 8, 2011                              PERETZ & ASSOCIATES


                                                     By: (-) *Yosef Peretz*
                                                     Yosef Peretz
                                                     Attorneys for Plaintiffs YESENIA GUITRON
                                                     and JUDI KLOSEK