IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

YESENIA GUITRON; and JUDI KLOSEK,

     Plaintiffs,

  v.

WELLS FARGO BANK, N.A.; WELLS FARGO & CO.; PAM RUBIO; and DOES 1-20,

     Defendants.

_____/

No. C 10-3461 CW

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT, DENYING AS MOOT MOTION TO SEVER, AND SETTING CASE MANAGEMENT CONFERENCE (Docket Nos. 64 and 74)

    Plaintiffs Yesenia Guitron and Judi Klosek allege that Defendants Wells Fargo Bank, N.A., Wells Fargo & Co., and Pam Rubio unlawfully retaliated and discriminated against them based on Plaintiffs' reporting of unlawful and unethical business practices, as well as their disability, age, gender and marital status.  Defendants move for summary judgment on Plaintiffs' claims against them and move to sever Plaintiffs' claims from one another.  Having considered the papers filed by the parties and their oral arguments at the hearing, the Court GRANTS in part Defendants' motion for summary judgment, and DENIES it in part. The Court also DENIES AS MOOT Defendants' motion to sever.

BACKGROUND

    The following summary presents any disputed facts in the light most favorable to Plaintiffs, as the non-moving parties.

I.   Facts related to Plaintiff Guitron

    In March 2008, Guitron, a single mother, began work as a Personal Banker One at the Wells Fargo branch in St. Helena,

United States District Court
For the Northern District of California

California.  Guitron Depo., Tr. 382:6, 409:6-13; Guitron Decl. ¶ 5.

Guitron was told on numerous occasions by "Branch management" to unbutton her shirt to get more sales.  Guitron Decl. ¶ 6.  One day Pam Rubio, the branch manager, sent her a text message requesting permission to open a package that Guitron had received from a customer, "an admirer," and asking who it was from.  Guitron Depo., Tr. 333:10-16.[1]  Isook Park, the branch service manager, made comments to Guitron, including, "Call your boyfriends and have them all open accounts."  Id. at 333:17-21.  She asked Guitron questions about whom she was dating and whom she would bring to Christmas parties or bank events.  Id.  On one occasion, Chris Jensen, another service manager, told Guitron, "Go and shake your skirt to the farm workers in the corner so we can get some accounts."  Id. at 333:22-334:1.  Guitron refused to engage in these practices and was offended by them.  Guitron Decl. ¶ 6.

Prior to the time that Guitron began to work at the St. Helena branch, Liz Mendez, who worked there as a Personal Banker from December 2000 through January 2007, was told about once a week by Rubio, "Maybe if you unbutton that top button you'll get more accounts."  Mendez Depo. Tr. 128:18-129:9; Mendez Decl. ¶ 2.  Marcela Franco, who was employed by Wells Fargo from November 2001

---

[1] Plaintiffs also argue that "Rubio encouraged younger women who worked at the Branch, including Guitron, to use their 'physical assets' to garner sales."  Opp. at 3.  Rubio was fifty-five years old in 2009.  Rubio Decl. ¶ 3.  However, Plaintiffs cite only evidence that Rubio made such comments to female employees other than Guitron and offer no evidence, including from Guitron, that Rubio did so to Guitron herself or in her presence.

United States District Court
For the Northern District of California

through January 2007, again, before Guitron began working there, heard Rubio make similar comments to other employees on multiple occasions.  Franco Depo. Tr. 87:7-88:23; Franco Decl. ¶ 2.  Matt Taylor, a single father who worked at the St. Helena branch as a financial consultant, was never encouraged to use his physical assets to achieve more sales.  Taylor Decl. ¶¶ 4-6.

In June 2009, Guitron asked to take eighteen days of paid family leave in order to care for her son who had surgery. Guitron Depo., Tr. 352:2 353:21.  Guitron was permitted to take the time off, but she was paid one week of vacation time and was given unpaid leave for the remainder of the time.  Id. at 352:4-7. The eighteen days that she was absent were originally counted as impermissible absences on her second quarter review and Guitron had to make multiple requests for this to be corrected.  Guitron Depo., Tr. 368:25-369:3; Drafts of 2009 Second Quarter Performance Reviews, Pls.' Exs. 49-57.

Guitron was required to submit a typed request to modify her work schedule to a six-day work week and to take a shorter lunch break and a longer break in the afternoon to pick up her children, while others were able to request days off or a vacation on handwritten Post-it notes.  Guitron Depo., Tr. 345:4-346:11.[2] Guitron believed that she was given "a hard time" when asking to leave early or late on particular days, although she was never

---

[2] In their opposition, Plaintiffs aver that the others who "gave notices on a post-it note" were "not single parents," and cite in support pages 345 to 349 of Guitron's deposition testimony.  In these pages, Guitron testified that the other individuals to whom she was referring included "Corina, Javier, Mary," but she did not state that these individuals or any others were not single parents.  See Guitron Tr. 345:4-349.

3

United States District Court
For the Northern District of California

denied such an accommodation.  Id. at 348:9-349:5.  She also

believed that other employees, including "Javier," were not given

a hard time when they made similar requests, because she did not

hear other people complain about this.  Id.[3]

From 2008 through 2009, Guitron repeatedly complained to

branch management about certain activities of other bankers within

the St. Helena branch.  Guitron Depo., Tr. 155:18-25, 172:4-176:6;

Guitron Decl. ¶¶ 20-56.[4]  Many of Guitron's complaints involved

another banker, Corina Zavaleta.  Id.  Some of Guitron's

complaints arose out of reports she received from customers about

problems with accounts, including accounts that other bankers at

the St. Helena branch had allegedly opened or closed without the

customer's permission or knowledge, and accounts about whose terms

the customer had been misled.  Id.  After customers complained to

her that they were not receiving their debit cards for an extended

_____

[3] Plaintiffs assert, "Even when Guitron would finally get
permission to leave to care for her children, Rubio would harass
her by calling her children's day care to 'ensure' that Guitron
was actually caring for her children, a practice that was unique
to Guitron only."  Opp. at 5.  However, this assertion is not
supported by the evidence cited by Plaintiffs.  At her deposition,
Guitron testified, "Other times they called back either the day
care or called me," Guitron Depo., Tr. 348:4-5, but she did not
specify who called her children's day care, for what purpose, or
that this practice was unique to her or to single mothers.

[4] Defendants object to the admissibility of portions of
Guitron's declaration, in which she describes complaints made by
customers which she reported to management, on the basis that they
constitute inadmissible hearsay and speculation for which she has
failed to establish personal knowledge.  While the statements made
by Guitron in her declaration are not admissible to establish the
truth of the customers' complaints, her statements are admissible
to establish the substance of the reports that Guitron herself
made to management.  According, Defendants' objections to the
admissibility of Guitron's declaration for this purpose are
OVERRULED.

United States District Court
For the Northern District of California

period of time, Guitron reported a concern to management that other bankers had been directing that the debit cards be mailed to the branch instead of the customers' homes, so that the bankers could re-order cards sent to the correct address. Guitron Decl. ¶ 28. Guitron also reported that other bankers were opening accounts with customer identification that was not accepted under company policy, such as a foreign driver's license that was not written in English. Id. at ¶ 33. At some point after Guitron made her complaints, Rubio stopped referring business to her. Guitron Depo., Tr. 246:2-8.

Guitron stated that, at the time of some of her complaints, she had two "main reasons to make these reports:" first, as a Wells Fargo employee, it was her responsibility to report any suspicions or acts of unethical behavior; and second, she wanted to protect herself from future retaliation. Ex. 99, at 2163-64. When asked during her deposition on May 12, 2011 whether she believed that the practices that she reported to management were unlawful, Guitron stated, "I don't think that I ever considered them illegal. I knew they were against our sales--sales practices." Guitron Depo. Tr. 241:16-18. She also stated that "somebody is getting financial gain for committing these activities. So it could be; it could not be. It just depends on the specifics." Id. at 241:25-242:2. In her declaration executed on December 8, 2011, Guitron states that she made complaints to management because she believed that these banking activities violated Wells Fargo's policies regarding sales practices and because "these practices resulted in employees receiving unearned bonuses under Wells Fargo's incentive plan." Guitron Decl. ¶ 3.

Guitron alleges that Wells Fargo failed to investigate her complaints properly.  At the branch level, two of the individuals whom Guitron accused of misconduct, Zavaleta and Mary Crisp, were never questioned about accusations leveled by Guitron.  Zavaleta Depo., Tr. 29:15-31:25; Crisp Depo., Tr. 153:2-22.  Both of these individuals are now assistant managers at the branch.  Zavaleta Depo., Tr.9:21-10:21; Crisp Depo., Tr. 181:15-182:25.  When Guitron contacted the regional Vice President, Greg Morgan, to request a meeting with him about her complaints, he directed her to contact Human Resources.  Ex. 67, emails between Guitron and Morgan.  Guitron also reported certain incidents to the Wells Fargo Ethics Hotline.  One investigator, Jodi Takahashi, who was assigned to Guitron's complaints, interviewed only Rubio about the complaints.  Takahashi Depo., Tr. 30:1-25, 36:5-38:8, 80:18-85:10.  When Guitron attempted to follow up with another investigator, Damian Brown, he declined to provide her with any information regarding the status of the investigation, citing confidentiality of the personnel matters involving the employees she had accused.  Pls.' Ex. 83, emails between Brown and Guitron.  Guitron also complained to Diana Brandenburg, a Human Resources consultant, whose ensuing investigation involved interviews of only Rubio and Guitron.  Guitron Depo., Tr. 181:25-182:14, 186:24-188:8; Brandenburg Depo., Tr. 50:21-51:13, 66:14-75:21.

Guitron adhered to "proper procedures and ethical means" to get sales, and she struggled to meet her sales requirements.  Guitron Decl. ¶ 8.  During the time that Guitron worked at Wells Fargo, she had a number of performance reviews.  In 2008, during the first two quarters that Guitron worked at Wells Fargo, she did

United States District Court
For the Northern District of California

1  not meet her minimum sales goals.  Guitron Depo., Tr.

2  427:23-428:14.  Rubio did not give her any corrective actions,

3  because she was still in training and a "rookie."  Id.  In the

4  fourth quarter of 2008, Guitron again did not meet her minimum

5  sales goals and Rubio gave her a verbal warning for this.  Id. at

6  433:20-435:13, Ex. 6.

7      In February 2009, Rubio informed all of the personal bankers

8  at the St. Helena branch that an assistant manager position had

9  been opened for the branch.  Guitron Decl. ¶ 36.  Guitron emailed

10  Rubio to express her interest in the position and Rubio indicated

11  her support by offering to discuss the position with Guitron.  Id.

12  However, Rubio told Guitron that she could not apply for the

13  position.  Id.

14      Guitron again failed to meet her minimum sales goals in the

15  first quarter of 2009 and, at that time, Rubio gave her an

16  informal warning.  Id. at 431:14-23.[5]  Guitron missed her sales

17  goals again in the second quarter of 2009 and Rubio extended her

18  informal warning.  Id.  Rubio wrote multiple drafts of Guitron's

19  performance review for that quarter, adding negative comments in

20

21  _____

22      [5] Plaintiffs assert that, in contrast, "other bankers
    testified that on occasions where they did not obtain their sales

23  minimum goals, they were not placed on informal warning by Rubio."
    Opp. at 9-10.  However, the cited evidence does not support this.

24  Plaintiffs cite the deposition testimony of Crisp and the
    declaration of Dreydy Metelin.  In her deposition, Crisp stated

25  that she did not remember if she met her minimum sales goals in
    the year before she was promoted to sales manager, not that she

26  was promoted despite missing these goals.  Crisp Depo., Tr.
    337:20-339:22.  In her declaration, Metelin stated that she was

27  not subjected to disciplinary action when she missed her sales
    goal for a single quarter.  Metelin Decl. ¶ 5(g).  Guitron was not

28  placed on an informal warning until she had missed her sales goals
    for multiple quarters.

United States District Court
For the Northern District of California

later drafts.  The original performance review said that Guitron had more unscheduled absences than she did, which was eventually corrected.  Guitron Depo., Tr. 368:25-369:3.  In the earlier drafts of the performance review, Rubio said that Guitron received a "perfect 5" under the section regarding "Ways to Wow" and made only positive remarks on this metric, but in later drafts, she added that Guitron was not doing enough to help others at the branch improve in this category.  Cf. Pls.' Ex. 49 at 3161, to Pls.' Ex. 52 at 3660.  Similarly, in earlier drafts, Rubio noted that Guitron missed her sales goals but that all bankers were struggling with a new pilot program for monthly incentives, while in later drafts, she removed the language that all bankers were struggling in this area.  Cf. Pls.' Ex. 49 at 3171-72, to Pls.' Ex. 57 at 3119-20.

In the fall of 2009, Rubio recorded certain accusations against Guitron.  Rubio documented a complaint from Zavaleta that Guitron was "borderline harassing her" with the complaints Guitron had made about Zavaleta's work ethics.  Pls.' Ex. 66.  Rubio also documented Guitron's alleged misuse of "banker notes" in violation of company policy.  Pls.' Ex. 90.  Rubio questioned Guitron regarding a customer complaint on an account that Guitron had opened.  Pls.' Exs. 95, 96.  Rubio also recorded an incident in which Zavaleta said that Guitron had pushed her into a desk out of malice.  Pls.' Exs. 93-94.

Between October 28, 2009 and November 22, 2009, several anonymous complaints were made to the Wells Fargo Ethics line regarding Guitron.  See Pls.' Exs. 84, 97, 100, 102, 103, 105, 106.  In his investigation, Takahashi examined various documents

United States District Court
For the Northern District of California

related to at least one of these complaints, and he did not interview anyone other than Rubio about any of the complaints. Pls.' Exs. 103, 105; Takahashi Depo., Tr. 43:7-49:2.  Takahashi did not substantiate any of the allegations against Guitron. Takahashi Depo., Tr. 43:7-49:2.

At Rubio's direction, in December 2009, Park sent a complaint to Brown about Guitron, related to an incident in October 2009 in which Guitron allegedly asked her about opening an account for a customer with a fake Mexican identification card.  Pls.' Ex. 108; Park Depo., Tr. 154:5 159:15.

In January 2010, Rubio sent Brandenburg and Hale Walker, the district manager, an email with a formal warning and corrective action plan for Guitron for missing her sales goals in the fourth quarter of 2009; this was never given to Guitron.  Pls.' Ex. 86-87.

On January 26 and 27, 2010, Rubio asked Guitron to attend a meeting.  Guitron Depo., Tr. 507:9-18, 510:6-17.  Guitron insisted that Rubio have "some neutral senior management people" present for the meeting.  Id. at 507:15-508:25; 510:6-17.  On January 27, after Guitron insisted on the presence of senior management a second time, Rubio told Guitron that senior management would not be present at the meeting and that Guitron had to meet with Rubio and Park.  Id. at 510:14-21.  Guitron said that she wanted someone from upper management present, because she could not stand any more retaliation.  Id. at 511:1-3.  Rubio then told Guitron that because Guitron did not want to meet with her, she was being insubordinate, and that she had to turn in her keys, clear her desk and leave.  Id. at 513:6-514:10.  Rubio did not state that

United States District Court
For the Northern District of California

Guitron was fired or terminated.  Id. at 514:16-22.  Guitron did not gather all of her personal belongings from her desk at that time.  Id. at 5:19-21.  At some point on that day, Park took a folder into the closet in which the shredder was stored, closed the door and emerged empty-handed.  Pls.' Ex. 113, at 2; Cook Depo., Tr. 130:1-4.[6]

Two days later, Guitron emailed Walker, Rubio, Park and several others, stating that she had been fired and asking to be allowed to gather the rest of her personal belongings.  Pls.' Ex. 114.  On January 29, 2010, Walker responded to Guitron, stating that Rubio had not terminated her and had instead placed her on administrative leave.  Guitron Depo., Tr. 524:13-525:9.  Walker asked that Guitron contact her to discuss her return to her job. Id.  Guitron replied by email stating that she had been terminated.  Guitron Depo., Ex. 14.  Guitron and Walker corresponded and spoke over the next several days.  Id. at Exs. 15, 19, 20.

On February 8, 2010, Rubio announced the hire of a new Personal Banker One, Andrew Keopraseuth.  Klosek Decl. ¶ 27.  When he started work, he took over Guitron's desk.[7]  Id.

On February 9, 2010, Walker sent Guitron another letter stating that she had not been terminated, that she was still an employee of Wells Fargo, and that she had to appear at Walker's office on February 11, 2010 to discuss her return to work or she

_____

[6] Plaintiffs argue that Park took documents from Guitron's desk into the closet, but cite no evidence that supports this.

[7] No evidence is offered to establish the date on which Keopraseuth began work and took over Guitron's desk.

would be deemed to have voluntarily resigned, effective on that date.  Guitron Depo., at Ex. 16.

On February 10, 2010, Guitron responded to Walker by email stating that she would not be returning to work, because she had already been terminated.  Id.

On February 12, Walker sent Guitron a letter by email and regular mail, stating that Walker had processed her voluntary resignation effective February 11, 2010, because Guitron had not reported to her office on that day.  Id. at Ex. 17.

Guitron filed a complaint with the Department of Labor against Wells Fargo alleging violations under section 206 of the Sarbanes-Oxley Act (SOX).  Second Amended Complaint (2AC) ¶ 69; Answer to 2AC ¶ 69.  Guitron alleges that she filed this complaint on or about May 11, 2010.  2AC ¶ 69.[8]  On June 14, 2010, Wells Fargo learned that Guitron had filed a complaint against it with the Department of Labor.  Defs.' Resps. to Guitron's Interrogatories, Set 2, at 5.

On June 18, 2010, Guitron filed complaints against Wells Fargo and Rubio with the California Department of Fair Employment and Housing (DFEH), alleging that they had subjected her to discrimination and failed to accommodate her based on "her status as a single woman and a single mother."  2AC ¶ 68, Ex. B.  Guitron listed certain conduct by Wells Fargo and Rubio that she alleged was discriminatory.  Id.  Guitron also indicated that she felt

---

[8] This complaint is not part of the record in this case. While Plaintiffs state that it is attached to the 2AC as Exhibit C, that exhibit instead contains documents related to Klosek. 2AC, Ex. C.

**United States District Court**
For the Northern District of California

1   that she was retaliated against, but did not provide descriptions

2   of actions that she believed were retaliatory.  <u>Id.</u>  Guitron was

3   given a right to sue notice by the DFEH on the same day.  <u>Id.</u>

4       On June 23, 2010, Guitron filed a complaint against Wells

5   Fargo with the Equal Employment Opportunity Commission (EEOC),

6   alleging discrimination based on sex and marital status and

7   retaliation for filing complaints.  2AC ¶ 67, Ex. A.  Guitron did

8   not provide a description of the particulars and instead stated

9   "See Attached DFEH."  <u>Id.</u>[9]  The EEOC issued Guitron a right to sue

10  letter on July 6, 2010.

11  II.  Facts related to Plaintiff Klosek

12      In approximately 1987, Klosek received a juris doctorate from

13  Southwestern University School of Law and was later admitted to

14  the state bar of California.  Klosek Depo., Tr. 9:25-10:12.

15      In September 2008, Klosek began work as a Registered Personal

16  Banker Two at the Wells Fargo branch in Sonoma, California.

17  Klosek Depo., Tr. 422:12-15.  Klosek was sixty-three or sixty-four

18  years old at the time she applied to Wells Fargo.  <u>Id.</u> at 80:5-8.

19  The St. Helena and Sonoma branches are in the same region and have

20  the same regional management.

21      On April 2, 2009, Klosek emailed her supervisor at the Sonoma

22  branch, John Alejo, to report that a customer had complained that

23  tellers had been taking money out of his mother's account instead

24  of his, that he was not sure why a joint savings account had been

25

26

27       [9] While this appears to refer to the DFEH complaint filed on
    June 18, 2010, Plaintiffs did not include an attachment to the
28  EEOC complaint when they filed it in the record of this case.  <u>See</u>
    2AC, Ex. A.

United States District Court
For the Northern District of California

opened for him and his mother, and that he wanted his name taken off all accounts.[10]  Pls.' Ex. 75.

Also on April 2, 2009, Klosek received a memorandum from Brandenburg confirming a conversation that the two had on March 24, 2009, in which Klosek had reported unfair treatment by Alejo and her coworkers at the branch.  Pls.' Ex. 78; Klosek Depo., Tr. 508:24-509:19.  In the memorandum, Brandenburg asked Klosek to let her know if she had additional concerns or facts that were not in the memorandum.  Pls.' Ex. 78 at WFB002344.  Klosek felt that Brandenburg left out certain points and misstated others.  Klosek Depo., Tr. 509:20-24.

On April 7, 2009, Klosek sent Brandenburg two lengthy emails documenting the complaints she made in their meeting.  Pls.' Exs. 76-77; Klosek Depo., Tr. 509:24-510:1.  In the emails, Klosek stated, among other things, that when she had returned to work after a leave of absence due to an illness and had suggested that she sit and welcome customers rather than stand, Alejo told her, "I am not having a WalMart greeter in my branch."  Pls.' Ex. 76, at 5.  See also Klosek Depo., Tr. 239:11-14 (testifying that Alejo had made this comment).  Klosek also complained that Alejo treated her differently after she returned from her medical leave, such as requiring her to ask permission to take breaks.  Pls.' Ex. 76, at 5.  Klosek further reported that, on a particular occasion when she called Alejo to tell him that she had a medical emergency and

---

[10] Plaintiffs contend that Klosek reported that the customer had said that the account was opened without his authorization. Opp. at 7. However, in Klosek's email, she stated the customer told her that he "wasn't sure why it was opened and why his mother and him were put on the account." Pls.' Ex. 75.

13

United States District Court
For the Northern District of California

was critically ill, he told her that "next time this happens I will write you up. I'm warning you." Id. at 4. She also complained that Alejo compared Klosek and her computer skills to his mother and his mother's computer skills. Klosek Depo., Tr. 239:15-18. Klosek also made complaints about other employees at the branch, including that a coworker, Tony Cervantes, preferred to work with younger women, which hindered her ability to do her job, including by preventing her from doing business with existing bank customers. Pls.' Ex. 77, at 3. Klosek also complained that Alejo showed favoritism toward Cervantes and another coworker and made excuses for their behavior, instead of addressing the problems. Pls.' Ex. 76, at 4-5; Pls.' Ex. 77, at 2. Klosek expressed concern that Alejo, as her manager, would be preparing performance reviews of her. Id. at 5.

In response to Klosek's concerns, Brandenburg interviewed about a dozen people who worked at the branch, including Alejo. Brandenburg Depo., Tr. 189:4-17, Ex. 4. On June 4, Klosek told Brandenburg that "accounts were excessively being opened and closed, and that I suspected bankers were unethically forcing customers to open and close accounts unnecessarily to gain" sales credits. Klosek Decl. ¶ 14. On that same day, during a telephone call, Brandenburg informed Klosek that she had been unable to substantiate Klosek's allegations. Klosek Depo., Tr. 510:20-511:5. Klosek then asked to transfer to another branch. Id. at 511:22-24. Klosek did not provide Brandenburg with geographic restrictions and Brandenburg offered her two choices of branches to which Klosek could transfer. Id. at 511:22-512:16. Klosek chose the St. Helena branch. Id. at 513:22-24. Brandenburg also

**United States District Court**
For the Northern District of California

gave Klosek a memorandum stating that she was unable to substantiate her allegations.  Klosek Depo. Tr. 543:11-544:19, Ex. 12.

In June 2009, Klosek transferred to the St. Helena branch. At that time, the St. Helena branch had not had a Registered Personal Banker Two since 2006 or 2007.  Rubio Depo., Tr. 287:20-288:10.

During each of the three quarters that Klosek had worked at the Sonoma branch, she failed to achieve at least some of her minimum sales goals.  Klosek Depo., Tr. 437:21-438:7.  Klosek attested that she believes that she was held accountable for her sales goals for days that she was absent from work due to medical reasons and that this negatively impacted her performance reviews. Klosek Decl. ¶ 5.  She also testified that, while at the St. Helena branch, she was "pretty much knocked out of the teller referral system" and got few referrals.  Klosek Depo. Tr. 207:8-24.[11]

Beginning around August 2009, Klosek raised concerns with the St. Helena branch about "unethical conduct, opening and closing accounts, forced sales, ordering products that customers don't want, . . . shoving products down customers' throats."  Klosek Depo., Tr. 370:20-376:3, 385:2-387:18.  On September 4, 2009,

---

[11] In this deposition excerpt offered by Plaintiffs, Klosek testifies that "she," a woman who is not identified in the transcript provided, managed the teller referral system unfairly, "along with Pam Rubio."  Klosek Depo. Tr. 207:8-24.  Klosek also testifies that, as a result of the unidentified woman's management, she was "knocked out of" the system.  Id.  In the cited excerpt, Klosek does not attribute this result to Rubio.

**United States District Court**
For the Northern District of California

Klosek objected to Rubio about being asked to give referral credit to a banker who had not made the referral.  Klosek Depo., Tr. 375:13-376:16; Pls.' Ex. 68.  On November 16, 2009, Klosek reported to Rubio that a customer wanted to close several accounts that another banker had "insisted on opening."  Pls.' Ex. 71. Klosek believed at the time that the conduct violated both Wells Fargo's ethical rules and the law, including "consumer rules and laws that you shouldn't conduct fraudulent activity."  Klosek Depo., Tr. 419:2-421:19.  Although Klosek did not know which specific "consumer rights laws" may have been violated, she thought the conduct may have violated "consumer rights -- a consumer has a right to know what he or she is buying, not to be forced into something they're not asking for and full disclosure." Id.  She reported these perceived violations because she thought that it was her responsibility, and that they were "contrary to our training, our visions and values."  Id. at 421:2-11.[12]  See

---

[12] Plaintiffs assert that, in October 2009, Rubio threatened Klosek that she would make her work at the branch difficult if Klosek supported Guitron's complaints against Zavaleta.  Opp. at 13.  However, most of the evidence cited by Plaintiffs does not support this assertion.  See Opp. at 13 (citing Klosek Decl. ¶ 24 (describing an unrelated email sent by Klosek to Rubio on December 28, 2009); Pls.' Ex. 71 (an unrelated email sent by Klosek to Rubio and Combs on November 16, 2009); Klosek Depo Tr. 375:13-376:16 (deposition testimony in which this is not stated); Pls.' Ex. 68 (emails between Klosek and Rubio on September 4, 2009 regarding referral credits and a possible violation of Wells Fargo ethical rules and policies); Klosek Decl. ¶ 29 (describing an email sent by Klosek to Rubio on March 12, 2010 about a lack of support from management)).

The one exhibit they cite that contains a similar statement is a list of allegations that Klosek prepared in early February 2010 for a meeting with Susan Eagles-Williams.  See Pls.' Ex. 80; Klosek Decl. ¶ 25.  To the extent that Plaintiffs offer this list to prove the truth of the allegations contained in it, the list is inadmissible as hearsay.

also Pls.' Ex. 68 (email from Klosek to Rubio on September 4, 2009 stating that she objected on that day "in the interest of fairness," because she believed giving someone unearned referral credit was contrary to what she was taught in the Wells Fargo ethics class and a "distortion of the policy").

At the St. Helena branch, Klosek refused to participate in this conduct herself and only secured her sales credits by following Wells Fargo's proper procedures and ethical means. Klosek Decl. ¶¶ 9, 10. She found it difficult to meet the sales goals set by Wells Fargo, which she characterizes as unreasonable. Id. at ¶ 10. She testified, "Due to my refusal to partake in unethical and fraudulent behavior and inability to meet my goals following proper procedure, I was subjected to poor performance reviews and disciplinary actions for missing those goals." Id.

In October or November 2009, Rubio, who was fifty-five years old at the time, told Klosek, "You're too old for banking," and that she had noticed her date of birth when she reviewed her file. Klosek Depo., Tr. 168:7-169:1; Rubio Decl. ¶ 3. In November 2009, Rubio asked Klosek if she had any plans for retirement. Id. at 237:22-238:8. In November or December 2009, Rubio told Klosek that she should read the book, "Bridging the Age Generation Gap." Id. at 233:13-234:4.

In early December 2009, Rubio gave Klosek her third quarter performance review. Klosek Depo., Tr. 471:13-22. The performance review stated that Klosek had received a verbal warning in October for not meeting her sales goals. Pls.' Ex. 61, at 4791, 4794.

However, prior to the review, Klosek had not received a verbal warning from Rubio.  Klosek Depo., Tr. 378:5-382:8. [13]

On December 12, 2009, Klosek emailed Rubio about her quarterly review.  Klosek Decl. ¶ 23.[14]

United States District Court
For the Northern District of California

_____

[13] Plaintiffs assert that Rubio created policies in order to prevent Klosek from performing her job; however, their assertions are not supported by the evidence they cite.

For example, Plaintiffs allege that, in October 2009, Rubio set forth a new policy "that Hispanic customers should only be served by Hispanic bankers," so that "Klosek was not allowed to assist Hispanic customers who made up 95% of the walk-in traffic at the Branch."  Opp. at 14 & n.35.  However, the trial policy to which they cite states, "If customers do not speak any English they need to be serviced by someone who is bilingual (whoever is available).  If customers do speak English they can go to any banker available."  Pls.' Ex. 126.  The policy does not state that Hispanic customers had to be served by someone of a particular race or ethnicity, and instead appears intended to ensure that customers who do not speak English are served by someone who can communicate with them.  Further, there is no evidence in the record that Klosek does not speak Spanish, that she was the only non-Spanish speaker at the branch or that 95% of the customers who come in do not speak any English.

Plaintiffs also assert that Rubio did not allow Klosek to take walk-in traffic.  Opp. at 14.  However, the evidence to which they cite, Klosek's deposition testimony, instead states that she was allowed to take walk-in referrals, but that she believed that a particular banker--not Rubio--gave her too few referrals.  Klosek Depo., Tr. 180:18-181:16.  Further, other evidence establishes that Rubio changed the prior policy that employees at the Personal Banker Two level were not allowed to take walk-in traffic, in order to allow Klosek to do so.  Rubio Depo. Tr. 238:19-25; Pls.' Ex. 126.

Plaintiffs also contend that Klosek was not allowed to take business clients, and that Rubio gave no reason for this.  Opp. at 14.  However, the only evidence that they cite in support of this is an unrelated performance review for Guitron.  See Rubio Depo. Tr. 166:16-170:24; Pls.' Ex. 128.

On December 28, 2009, Klosek sent Rubio an email documenting a conversation from several days before. Pls.' Ex. 118. Klosek stated that, in that conversation, Rubio had asked Klosek about several matters, including Klosek's activities in opening a particular bank account and documenting a complaint against another banker, and Klosek had asked Rubio to make certain changes to her third quarter performance review. Pls.' Ex. 118. On January 5, 2010, Rubio emailed Takahashi asking him to look into an account that was apparently opened by Klosek and for which the second identification appeared to be falsified. Takahashi Depo., Tr. 114:21-119:5. After an investigation, Takahashi determined that Klosek was not the one who had entered the information. Id.

On January 11, 2010, Rubio emailed a draft informal warning for Klosek to Walker and Brandenburg. Pls.' Ex. 119, at 1935. In the email, Rubio stated that "based on her high performance on the investment piece . . . she might not warrant an informal once the calculations are completed." Id. Walker responded that she "wouldn't use the word impressive" in the performance review and that Klosek "absolutely warrants an informal" warning because she

---

[14] Although Klosek states that this email is contained in Plaintiffs' Exhibit 206, it appears that Plaintiffs failed to file that exhibit in the record of this case. See Docket No. 96, at 3-4 (placeholder stating that Exhibit 206 was filed under seal); Order Granting in Part and Denying in Part Plaintiffs' Motion to File Under Seal, Docket No. 124 (granting Plaintiffs permission to file Exhibits 51, 52, 56, 72-74, 172-175, 177-195 and 197-201 under seal and directing them to file the remaining exhibits in the public record); Pls.' Index of Additional Unsealed Exhibits, Docket No. 126 (omitting Exhibit 206); Pls.' Index of Evidence under Seal, Docket No. 129 (omitting Exhibit 206).

United States District Court
For the Northern District of California

"did not meet minimum expectations in 3 out of the 4 categories." Id. at 1934.

On January 12, 2010, Alejo, Klosek's supervisor at the Sonoma branch, submitted her performance reviews from the first and second quarters of 2009. Alejo Depo., Tr. 110:8-11. Alejo usually tried to do this type of review within a month of the quarter for which the review applied. Id. at 84:22-85:9. Both of these reviews noted that Klosek did not meet her sales goals. Pls.' Exs. 120, 121.[15]

On February 6, 2010, Klosek sent Rubio an email about not receiving the "same leads, referrals, introductions and level of support" given to other bankers, including "Dreydy, Mary, Xavier and even our very temporary banker, Daniel." Klosek Decl. ¶ 26; Pls.' Ex. 207. The examples that Klosek provided were that Rubio said that she could not "do Business Solutions like the others," that Rubio took a long time to respond to Klosek's request that "all Bankers and tellers send CD referrals and renewals to me," and that Rubio was "trying to force her to work now on Wednesdays until 7PM," although Klosek had told her that she could not "do that for personal reasons." Id.

On February 11, 2010, Klosek emailed Park with concerns about the calculation of her paid time off and sick leave during the prior month, and sent a copy to Rubio. Klosek Decl. ¶ 28, Ex. 58.

---

[15] In the list of allegations that Klosek prepared in early February 2010 for a meeting with Susan Eagles-Williams that was discussed above, Klosek stated that Brandenburg had told her that she would receive "no further reviews from John Alejo." Pls.' Ex. 80, at WFB00862. However, as previously discussed, this list is inadmissible as hearsay to support the fact that Brandenburg told her this, and Plaintiffs cite no evidence in support of this fact.

United States District Court
For the Northern District of California

Klosek complained that Chris Jensen required her to submit a doctor's note after the third day of her illness, although Wells Fargo policy required a note only after the seventh day.  Id. Klosek also said that January 13 or 14 was marked as her first day of leave, but that she had been working through January 18.  Id.

On February 22, 2010, Klosek met with Rubio and Walker "to address the concerns" that Klosek had raised with Rubio.  Klosek Depo., Tr. 518:23-25, 520:9-12.[16]  During the meeting, Klosek interrupted Walker once.  Id. at 522:20-25.  Klosek told Walker that "it's sad, as regional director, you're allowing this meeting to occur."  Id. at 522:5-25.  At that point, Walker instructed Rubio to document Klosek's comment and placed Klosek on paid administrative leave for a week and a half.  Id. at 522:13-524:2.[17]

---

[16] Neither party offers evidence regarding what concerns Rubio and Walker intended to address in this meeting.

[17] Plaintiffs assert that "Wells Fargo does not allow employees to be placed on administrative leave as a punitive measure."  Opp. at 14.  Plaintiffs cite the following deposition testimony of Deborah Cook:

Q: Based on your experience with Wells Fargo, is it your understanding that administrative leave may serve as a disciplinary action as opposed to interim action during an investigation? . . .

A: I've never been aware of it used as a punitive measure.

Q: . . . So would you agree with me that placing someone on administrative leave is not part of the disciplinary procedure of Wells Fargo to your knowledge? . . .

A: To my knowledge, no.

Q: Did you ever recommend to place a team member on administrative leave as a form of discipline?

A: Never.

Q: Would you ever do that?

In February 2010, Klosek asked Susan Eagles-William that Wells Fargo conduct "an objective, independent investigation" of her concerns. Klosek Depo., Tr. 516:13-16. Wells Fargo engaged Debbie Cook, a human resources consultant from Southern California, to conduct an investigation; prior to that time, Cook did not have knowledge of the St. Helena branch, Rubio, Klosek or Guitron. Eagles-William Depo., Tr. 227:17-25; Cook Depo., Tr. 46:22-47:19.

When Cook completed her investigation on or before April 29, 2010, she concluded that Klosek's "allegation of harassment and retaliation" were "largely unsubstantiated," but that there was an appearance of favoritism at the branch, along with an environment in which some team members were afraid to come forward to express concerns out of a fear of reprisal. Pls.' Ex. 137, at WFB003921. The specific allegations that Cook investigated were (1) that Alejo's performance reviews of Klosek "contained errors, omissions and misstatements," (2) that Rubio "falsely accused Klosek of participating in a complaint involving another banker," undermining her credibility with her coworkers; (3) that Rubio was rude, generally unresponsive, managed by favoritism, and offered support selectively; (4) that Klosek had not received incentive credit for a large sale; (5) that she received few referrals, if

---

A: I've never encountered a situation in which I would.

Cook Depo., Tr. 45:2-22. This testimony does not establish that such use of administrative leave is contrary to Wells Fargo policy, but rather that Cook was unaware whether it was and that she had not had occasion to do so.

any, and that customers referred by Rubio were not interested; (6) that Rubio instructed her to give referral credit to Zavaleta for a transaction that Klosek referred; (7) that she was not allowed to attend an offsite sales event to generate new business unless she used personal time; (8) that Rubio said she was overqualified for her position and Rubio would make sure she was promoted to financial advisor but this did not happen; (9) that her chance to be promoted to financial advisor "was blocked by senior management" and the position was filled by a "young guy from Sacramento; (10) that Rubio completed the 2009 third quarter review and said she had given Klosek a verbal warning when she had not; (11) that Rubio "picked on her for everything; and (12) that Park told her to lie to a bank official and say she was busy to avoid participating in a compliance review.  Id. at WFB003916-17. Klosek alleges that Cook failed to investigate her claims thoroughly.  Opp. at 15-16.

On April 24, 2010, Klosek filed a DFEH complaint against Wells Fargo, Rubio, and Walker, alleging that they discriminated against her because of her age and national origin, and retaliated against her for making complaints about unlawful and unethical company policies and practices.  2AC ¶ 127, Ex. E.  DFEH issued Klosek right to sue letters on the same day.  Id.

On April 29, 2010, Klosek filed a charge with the EEOC against Wells Fargo of discrimination based on age, disability and

23

national origin.  2AC ¶ 126, Ex. C.[18]  The EEOC issued Klosek a
right to sue letter on May 6, 2010.  Id.

Klosek filed a complaint with the Department of Labor against
Wells Fargo alleging violations under section 206 of the SOX.  2AC
¶ 129; Answer to 2AC ¶ 129.  Klosek alleges that she filed this
complaint on or about May 11, 2010.  2AC ¶ 129.[19]  On June 14,
2010, Wells Fargo learned that Klosek had filed a complaint
against it with the Department of Labor.  Defs.' Resps. to
Guitron's Interrogatories, Set 2, at 5.

On May 14, 2010, Klosek went on a leave of absence due to
work-related stress.  Klosek Depo., Tr. 248:20-249:1.  Klosek did
not pursue a worker's compensation claim for her leave.  Id. at
528:21-529:7.  In late June 2010, Klosek learned that she had
breast cancer.  Id. at 250:3-9.  She subsequently extended her
leave several times.  Id. at 256:10-13.

Klosek received a letter dated July 29, 2010 from "Wells
Fargo Leave Management" stating that she had exhausted her Family
and Medical Leave Act protected leave and that her absences would
no longer be protected under the Act.  Klosek Depo., Ex. 4; Klosek
Depo. Tr. 259:3-14.  Subsequently, Klosek's leave was extended
through September 30, 2010.  Mot. at 22; Opp. at 16.

---

[18] On the complaint form, Klosek stated, "See attached."  Id.
However, Plaintiffs did not include an attachment to this
complaint when they filed it with this Court.  See 2AC, Ex. C.

[19] This complaint is not part of the record in this case.
While Plaintiffs state that it is attached to the 2AC as Exhibit
C, that exhibit instead contains an EEOC complaint filed by Klosek
and a right to sue letter issued by the EEOC.  2AC, Ex. C.

United States District Court
For the Northern District of California

On September 9, 2010, Walker sent Klosek a letter stating, in relevant part, "Due to business needs, we cannot continue to hold your position open for you.  It is critical that we have adequate staffing and an active Registered Banker available to assist our customers.  Accordingly, we will be posting a Registered Banker position on September 13, 2010 . . . If you plan on returning to work within the next few weeks, please let us know immediately." Klosek Depo., Ex. 5.  The letter also stated that, if Wells Fargo filled her position, she could extend her leave for up to twenty-four months, and if she was cleared to return to work during that time, she would be placed on a ninety day job search leave, during which time Wells Fargo would assist her in searching for vacant positions at Wells Fargo for which she qualified.  Id.

In response, on September 13, 2010, Klosek sent Walker an email stating, "At this time, I anticipate that I will be back to work no later than on December 11, 2010 or before," as directed by her doctor, and alleging that Defendants were filling her position based on discrimination and retaliation and not because of a legitimate business need.  Klosek Depo. Tr. 275:20-276:15, Ex. 6.

Klosek was not medically cleared to return to work until March 1, 2011.  Id. at 256:13-20.  In the interim, in January 2011, Chris Sipes was promoted from a Personal Banker One position at the Sonoma branch to fill Klosek's vacant Registered Personal Banker Two position at the St. Helena branch.  Sipes Depo., Tr. 12:13-16, 12:21-13:2, 26:18-27:5.  Sipes had obtained the necessary qualifications for this position in January 2011.  Id. at 27:4-5.

When Klosek was able to return to work on March 1, 2011, she was given a job search leave for ninety days; Klosek understood that she had been terminated as of March 1 with privileges to search for an internal posting.  Klosek Depo., Tr. 262:5-265:16, 283:25-285:4, Ex. 7.  In early March 2011, Klosek spoke to a recruiter about issues she was having accessing the internal job search system.  Klosek Decl. ¶ 40.  That recruiter stated that she could not help Klosek look for a job and that it was Klosek's responsibility to get access to the system and look for a job.  Id.

Klosek alleges that she filed an additional DFEH complaint against Wells Fargo on March 30, 2011 and that DFEH issued her a right to sue letter on the same day.  2AC ¶ 128.  However, Klosek has not presented any evidence, and Defendants have not admitted, that she did so.[20]

Klosek asked Walker for a letter of recommendation during this internal hiring process.  Klosek Depo. Tr. 301:7-302:7.  Walker told Klosek that it was not her "practice to issue any type of recommendation letter for either current or former employees" and directed Klosek to the neutral reference policy that applied to external prospective employers outside of Wells Fargo.  Id.; Pls.' Ex. 209, email from Walker to Klosek dated April 15, 2011.

During the first and second quarters in 2011, Alejo believed that there was a need for an additional Personal Banker Two in the Sonoma branch and informed Walker, his supervisor, of this need.

[20] Plaintiffs state that they attached these documents to the 2AC as Exhibit F.  However, they failed to include an Exhibit F with their 2AC.

Alejo Depo. Tr. 51:3-53:19.  He does not recall the position being posted.  Id.  Although Klosek was searching the postings on the internal job search system on a daily basis, she never saw a posting for a Personal Banker Two position in either the Sonoma or St. Helena branch between March 1, 2011 and June 20, 2011, when her access to the internal system was terminated.  Klosek Decl. ¶ 38.  During that time, she applied to at least nine positions within Wells Fargo, but she was not accepted to any of those positions and was not re-hired by Wells Fargo.  Id. ¶ 39.

Sipes was moved back to the Sonoma branch in August 2011. Sipes Depo., Tr. 38:4-11.[21]

III. The Instant Action

Plaintiffs initiated the instant case on August 6, 2010. Docket No. 1.  They amended their pleadings on November 15, 2010 and on April 29, 2011.  Docket Nos. 9, 26.

Guitron asserts five claims against Wells Fargo: (1) retaliation under SOX; (2) discrimination based on her status as a single female and a single mother, in violation of Title VII and California's Fair Employment and Housing Act (FEHA); (3) retaliation in violation of Title VII and FEHA; (4) wrongful discharge in violation of public policy as expressed in Title VII, FEHA and SOX; and (5) failure to prevent discriminatory practices in violation of Title VII and FEHA.  Guitron also asserts a claim

---

[21] Defendants assert, "Walker testified that she transferred Sipes temporarily back to the Sonoma branch in August 2011 to fill a staffing shortage at the Sonoma branch."  Reply, at 18. Defendants, however, have not offered any such testimony.

**United States District Court**
For the Northern District of California

1 under FEHA against Rubio for harassment based on her status as a

2 single woman and single mother.

3      Klosek asserts six claims against Wells Fargo:

4 (1) retaliation under SOX; (2) discrimination based on her age and

5 medical condition in violation of Title VII and FEHA;

6 (3) retaliation in violation of Title VII and FEHA; (4) wrongful

7 discharge in violation of public policy as expressed in Title VII,

8 FEHA and SOX; (5) failure to prevent discriminatory practices in

9 violation of Title VII and FEHA; and (6) denial of accommodation

10 under FEHA.  Klosek also asserts a claim under FEHA against Rubio

11 for harassment based on her status as a woman over the age of

12 forty.

13                          LEGAL STANDARD

14      Summary judgment is properly granted when no genuine and

15 disputed issues of material fact remain, and when, viewing the

16 evidence most favorably to the non-moving party, the movant is

17 clearly entitled to prevail as a matter of law.  Federal Rule of

18 Civil Procedure 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

19 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89

20 (9th Cir. 1987).

21      The moving party bears the burden of showing that there is no

22 material factual dispute.  Therefore, the court must regard as

23 true the opposing party's evidence, if supported by affidavits or

24 other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,

25 815 F.2d at 1289.  The court must draw all reasonable inferences

26 in favor of the party against whom summary judgment is sought.

27 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

28

587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

**United States District Court**
For the Northern District of California

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial. <u>Id.</u> at 1107.

DISCUSSION

Defendants move for summary judgment on all claims asserted by both Plaintiffs, and to sever their claims from one another.

I.    Plaintiffs' claims for retaliation under SOX

"Section 1514A(a)(1) of Title 18 prohibits employers of publicly-traded companies from 'discriminat[ing] against an employee in the terms and conditions of employment' for 'provid[ing] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.'" <u>Van Asdale v. Int'l Game Tech.</u>, 577 F.3d 989, 996 (9th Cir. 2009). Subsection (b)(2) "further specifies that § 1514A claims are governed by the procedures applicable to whistle-blower claims brought under 49 U.S.C. § 42121(b)," which, "in turn, sets forth a burden-shifting

30

**United States District Court**
For the Northern District of California

procedure by which a plaintiff is first required to make out a prima facie case of retaliatory discrimination; if the plaintiff meets this burden, the employer assumes the burden of demonstrating by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." Id.

A.   The prima facie case under SOX

An employee seeking to establish a prima facie case of unlawful retaliation under § 1514A must prove four elements:

> (a) the employee engaged in a protected activity or conduct;
>
> (b) the named person knew or suspected, actually or constructively, that the employee engaged in the protected activity;
>
> (c) the employee suffered an unfavorable personnel action; and
>
> (d) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action.

Id. at 996 (quoting 29 C.F.R. § 1980.104(b)(1)(i)-(iv)) (internal formatting and quotation marks omitted).

1.   Protected activity

"To constitute protected activity under Sarbanes-Oxley, an employee's communications must definitively and specifically relate to one of the listed categories of fraud or securities violations under 18 U.S.C. § 1514A(a)(1)." Id. at 996-97 (internal formatting and quotation marks omitted); see also 18 U.S.C. § 1514A(a)(1) (listing covered categories of fraud). The Ninth Circuit has also stated that "to trigger the protections of the Act, an employee must also have (1) a subjective belief that

the conduct being reported violated a listed law, and (2) this belief must be objectively reasonable."  Id. at 1000.

Defendants argue that Plaintiffs' complaints related to violations of internal company policies, not to bank fraud,[22] and that neither Plaintiff had a subjective and objectively reasonable belief that the conduct she was reporting was bank fraud.

"The essential elements of bank fraud under [the Act] are: '(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC [Federal Deposit Insurance Corporation].'"  United States v. Rizk, 660 F.3d 1125, 1135 (9th Cir. 2011) (quoting United States v. Warshak, 631 F.3d 266, 312 (6th Cir. 2010)).  "Intent to defraud may be established by circumstantial evidence."  Id. (citing United States v. Sullivan, 522 F.3d 967, 974 (9th Cir. 2008) (holding, in mail and wire fraud case, that "the scheme itself may be probative circumstantial evidence of an intent to defraud")).

Plaintiffs have established a genuine dispute of material fact as to whether Guitron's reports related to bank fraud. Plaintiffs presented evidence that Guitron reported that her

---

[22] In their opposition, Plaintiffs contend that their complaints were related to "bank, wire and mail fraud."  Opp. at 19.  However, in the operative complaint, they did not allege wire or mail fraud as a basis for this claim.  See 2AC ¶ 134. Accordingly, Plaintiffs may not assert this new theory to defeat summary judgment.  See Federal Rule of Civil Procedure 9(b) ("a party must state with particularity the circumstances constituting fraud or mistake" in its pleading); see also Hardin v. Wal-Mart Stores, Inc., 2010 U.S. Dist. LEXIS 125410, at *5 (E.D. Cal.) ("In opposing summary judgment, plaintiffs may not rely on new claims or new theories under a claim that was plead in the complaint.").

former colleagues were engaging in practices such as opening and
closing accounts without customer permission or awareness or
without proper identification, which would allow them to obtain
otherwise unearned bonuses from Wells Fargo, thereby defrauding
it.

Defendants' arguments to the contrary are unavailing.
Defendants contend that Guitron failed to present evidence that
Defendants had the necessary intent to participate in bank fraud.
See Mot. at 8; Reply at 3, 4.  However, Guitron must prove only
that she had a subjective and objectively reasonable belief that
the colleagues she reported were engaged in bank fraud; she need
not prove that Defendants themselves engaged in bank fraud.

Further, contrary to Defendants' argument, it is not
necessarily fatal to Guitron's claim that she did not investigate
whether or not her colleagues were actually engaged in fraud and
that she based her complaints on reports from customers or her own
suspicions about the transactions.  See Van Asdale, 577 F.3d at
1001 ("It is not critical to the Van Asdales' claim that they
prove that Anchor officials actually engaged in fraud in
connection with the merger; rather, the Van Asdales only need show
that they reasonably believed that there might have been fraud
. . .").  From the evidence presented, a jury could conclude that
Guitron's beliefs were objectively reasonable.

Finally, considered in the light most favorable to Guitron as
the non-moving party, the evidence could support a finding that
Guitron had a subjective belief that the activity she reported may
have been unlawful, even though she was unsure.  Cf. Gale v. Dept.
of Labor, 384 Fed. App'x. 926, 930 (11th Cir. 2010) (finding no

33

subjective belief where the employee testified that he "did not believe that" the company had engaged in any kind of illegal or fraudulent activity when he made the reports).

Defendants, however, have established that there is no material factual dispute that Klosek did not engage in activity protected by SOX.  Unlike Guitron, Klosek reported conduct akin to overly aggressive sales techniques, which may have been unethical or in violation of Wells Fargo's sales policies, but which could not objectively be considered bank fraud.  Further, Klosek did not have a subjective belief that these practices amounted to bank fraud.  Although she testified that she believed that her colleagues were engaged in "unlawful behaviors," she believed that they were unlawful because they violated "consumer rights"-- which she described as the consumer's rights "to know what he or she is buying," to "full disclosure" and "not to be forced into something they're not asking for"--not because the practices were bank fraud.  Klosek Depo., Tr. 419:2-421:19.  Because Klosek cannot establish that she engaged in protected activity, she fails to establish a prima facie case for a SOX violation.  Thus, Defendants' motion for summary judgment is GRANTED as to Klosek's claim for retaliation under SOX.

           2.    Knowledge of decision-maker

     Plaintiffs have offered evidence, and Defendants do not dispute, that Defendants knew or suspected, actually or constructively, that Guitron had engaged in activity protected by SOX.  Accordingly, Plaintiffs have established this element of Guitron's prima facie case for a SOX retaliation claim.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

### 3.   Unfavorable personnel action

Defendants contend that Plaintiffs have failed to offer evidence that Guitron suffered a "materially adverse" employment action.  Mot. at 8 (quoting Allen v. Admin. Review Bd., 514 F.3d 468, 476 n.2 (5th Cir. 2008)).  Plaintiffs respond that she suffered many adverse employment actions and that she need not show that any was materially adverse.

The parties dispute the relevant standard for determining whether an employee has suffered an "unfavorable personnel action" under SOX.  Defendants argue that the alleged action must be "materially adverse," meaning that "it well might have dissuaded a reasonable worker from making or supporting" the protected report.  Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006) (quotations omitted).  Defendants base their argument on Burlington Northern, which addressed the meaning of "adverse employment action" in the Title VII context.  To argue that the Court should apply this standard in the SOX context, Defendants rely on the Fifth Circuit's discussion in Allen v. Admin. Review Bd., 514 F.3d 468, 476 n.2 (5th Cir. 2008), in which that court applied the Burlington Northern definition to SOX claims.  In Allen, the Fifth Circuit recognized that the Department of Labor's Administrative Review Board (ARB), which issues final agency decisions for the Secretary of Labor in a variety of contexts, including SOX claims, had adopted the definition of "adverse employment action" from Burlington Northern for claims brought under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U.S.C. § 42121.  514 F.3d at 476 n.2 (citing Hirst v. Southeast Airlines, Inc., 2007 DOL Ad. Rev. Bd.

**United States District Court**
For the Northern District of California

LEXIS 7, at *4-5).  Because of the similarity between the AIR 21

and SOX statutes, the Fifth Circuit decided to apply the

Burlington Northern definition to SOX claims.  Id.

Since those decisions, the ARB has issued two additional

relevant opinions, which have materially undermined the reasoning

underlying Allen.  First, in Williams v. America Airlines, Inc.,

ARB Case No. 09-018 (2010), the ARB held that, while persuasive,

the Burlington Northern "materially adverse" test did not control

in cases under AIR 21, in which the statutory language is broader

than in Title VII.  The ARB stated instead that, based on the

clear language of the AIR 21 statute and congressional intent to

have strong whistleblower protection for aviation employees, the

term "'adverse actions' refers to unfavorable employment actions

that are more than trivial, either as a single event or in

combination with other deliberate employer actions alleged."  Id.

at *15.  See also id. at 14 (citing Burlington Northern, 548 U.S.

at 68, for examples of trivial actions, including "petty slights,"

"minor annoyances," "personality conflicts" and "snubbing by

supervisors and coworkers").  The ARB further held that the

statute "prohibits the act of deliberate retaliation without any

expressed limitation to those actions that might dissuade the

reasonable employee."  Id. (emphasis added).  The ARB also

expressed the belief that "some actions are per se adverse (e.g.,

termination of employment, suspensions, demotions)."  Id. at 15

n.75.

More recently, in Menendez v. Halliburton, Inc., 2011 DOL Ad.

Rev. Bd. LEXIS 83, the ARB held that, because of the similarity

between the AIR 21 statutory language and the broad language in

SOX, "the <u>Williams</u> standard of actionable adverse actions" is "likewise applicable" to SOX claims. <u>Id.</u> at *37. Thus, under the standard set forth by the ARB, "adverse actions" in the SOX context also "refers to unfavorable employment actions that are more than trivial, either as a single event or in combination with other deliberate employer actions alleged." <u>Id.</u> at *37-38. Nonetheless, the analysis in <u>Burlington Northern</u> continues to be a "helpful guide." <u>Id.</u> at *38.

Plaintiffs have offered substantial evidence, and Defendants do not dispute, that Guitron suffered unfavorable employment actions, including suspension and poor performance reviews. Thus, Plaintiffs have established this element of Guitron's prima facie case for a SOX retaliation claim.

### 4.   Contributing factor

Plaintiffs argue that the fact that the purportedly retaliatory acts occurred during the same time period when Guitron was making complaints is sufficient to raise an inference that her protected activity was a contributing factor to the unfavorable employment actions. Viewing the circumstances as a whole, the Court agrees that Plaintiffs have introduced evidence sufficient to support such an inference.

### B.   Non-retaliatory reason

When a plaintiff establishes a prima facie case of unlawful retaliation under SOX, the burden then shifts to the defendant to demonstrate "by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." <u>Van Asdale</u>, 577 F.3d at 996.

United States District Court
For the Northern District of California

The Court finds that the undisputed facts establish that Defendants have met this burden.  The evidence demonstrates that, without Guitron's protected activity, Defendants would have issued her verbal and informal warnings, because she failed to meet her sales goals for each quarter in which she received a warning. Despite their assertions to the contrary, Plaintiffs have not introduced evidence that Defendants inconsistently implemented their personnel management policies, or that others who performed similarly were not given such warnings.  Further, Defendants have established a non-retaliatory reason for placing Guitron on administrative leave: her insubordination in refusing to meet with her manager, Rubio.  While Plaintiffs argue that this reason was pretextual because using administrative leave as a punitive measure was purportedly contrary to Wells Fargo's policy, Plaintiffs have not established the existence of any such policy. Defendants have also established a non-retaliatory reason for Guitron's termination: her refusal to return to work after Walker repeatedly informed her that she had only been placed on administrative leave and was not fired.  Plaintiffs have not offered evidence that this reason for her termination was pretextual.

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Guitron's claim for retaliation under SOX.

**United States District Court**
For the Northern District of California

II.  Discrimination in violation of Title VII and FEHA

Plaintiffs contend that Defendants discriminated against Guitron based on her status as a single woman[23] and against Klosek based on her age[24] and disability status.

In disparate treatment cases, plaintiffs can prove intentional discrimination through direct or indirect evidence. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985).  Plaintiffs argue that they can prove their case through both methods.

A.  Direct evidence of discrimination

"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." DeJung v. Superior Court, 169 Cal. App. 4th 533, 550 (2008).  See also Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (same).  Direct evidence "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."  Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1095 (9th Cir. 2005).  "Comments demonstrating discriminatory

---

[23]  In the 2AC, Guitron based her claims on her status as a single woman and mother.  However, in Plaintiffs' opposition to Defendants' motion for summary judgment, she argued that she was discriminated against as a "single female," and did not pursue claims based on discrimination against her as a single mother. See Opp. at 25-27.

[24] Klosek asserts her claim for age discrimination under Title VII and FEHA.  2AC ¶¶ 161-62, 202.  However, Title VII does not prohibit discrimination on the basis of age.  See 42 U.S.C. § 2000e-2 (prohibiting employment discrimination based on "race, color, religion, sex, or national origin").  Instead, federal law prohibits age discrimination in employment through the Age Discrimination and Employment Act of 1967 (ADEA), 29 U.S.C. § 621, et seq.  Accordingly, the Court GRANTS Defendants' motion for summary judgment on Klosek's claim for age discrimination under Title VII.

United States District Court
For the Northern District of California

animus may be found to be direct evidence if there is evidence of a causal relationship between the comments and the adverse job action at issue." DeJung, 169 Cal. App. 4th at 550.

Plaintiffs argue that they have direct evidence of discriminatory animus against both Guitron and Klosek. However, that "Guitron was pressured to shake her skirt, expose her cleavage and generally use sex to earn" daily sales credit, Opp. at 25, is not evidence of discriminatory animus toward single women without inference or presumption. Further, Plaintiffs offer no evidence that these actions were connected to any particular adverse job actions taken against Guitron. Similarly, that "Klosek was shunned, called a 'Wal-Mart greeter,' questioned about her retirement, and even given a book to 'help' her relate to the younger staff," Opp. at 25, is not evidence of discriminatory animus based on age or disability status without inference or presumption. Only Rubio's comment that Klosek was "too old for banking" is direct evidence of discrimination based on age. Further, Rubio made this comment shortly before giving Klosek her third quarter performance review, in which Rubio incorrectly asserted that Klosek had received a verbal warning for her performance. See Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1039-40 (9th Cir. 2005) ("a single discriminatory comment by a plaintiff's supervisor or decision maker is sufficient to preclude summary judgment for the employer," and where "the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision").

Defendants contend that Klosek's negative performance ratings were not adverse employment actions, because they did not materially affect the terms and conditions of her employment. Klosek's regular compensation, position and title were not decreased by her negative performance reviews. Brandenburg Decl. ¶ 3. However, there is evidence in the record that employees could receive monetary bonuses, beyond their normal income, for achieving daily sales goals, if they also met certain other requirements. See Rubio Depo. Tr. 76:25-79:15. Further, the Ninth Circuit has found that "undeserved performance ratings, if proven, would constitute 'adverse employment decisions.'" Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

Because Klosek has raised a material question of fact as to whether Defendants subjected her to discrimination based on her age, the Court DENIES Defendants' motion for summary judgment on her claim for age discrimination under FEHA.

B.   Circumstantial evidence of discrimination

Because direct proof of intentional discrimination is rare, such claims may also be proved circumstantially. See Dominguez-Curry, 424 F.3d at 1037. Title VII and FEHA claims based on circumstantial evidence are analyzed through the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In the first step of the McDonnell Douglas analysis, a plaintiff must establish a prima facie case of discrimination. See Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008).

A prima facie showing includes proof that (1) the plaintiff is a member of a protected class; (2) the plaintiff is qualified

**United States District Court**
For the Northern District of California

for the position in question or is performing her job
satisfactorily; (3) the plaintiff suffered an adverse employment
action; and (4) the plaintiff was treated differently than a
similarly situated employee who did not belong to the same
protected class.  Cornwell v. Electra Cent. Credit Union, 439 F.3d
1018, 1028 (9th Cir. 2006); Coleman v. Quaker Oats Co., 232 F.3d
1271, 1281 (9th Cir. 2000) (citing Nidds v. Schindler Co., 113
F.3d 912, 917 (9th Cir. 1997)); Washington v. Garrett, 10 F.3d
1421, 1433 (9th Cir. 1993); Sischo-Nownejad v. Merced Community
College, 934 F.2d 1104, 1109-10 & n.7 (9th Cir. 1991).  See also
Faust v. California Portland Cement Co., 150 Cal. App. 4th 864,
886 (2007) (for a disability discrimination claim under FEHA,
requiring a plaintiff to show "(1) he suffers from a disability;
(2) he is otherwise qualified to do his job; and, (3) he was
subjected to adverse employment action because of his
disability").  The amount of evidence that must be produced to
make the prima facie case is "very little."  Sischo-Nownejad, 934
F.2d at 1110-11.

Once a plaintiff has established a prima facie inference of
discrimination, he or she will generally have raised a genuine
issue of material fact regarding the legitimacy of the employer's
articulated reason for the adverse employment action.
Accordingly, a factual question will almost always exist, and
summary judgment will not be appropriate.  Id. at 1111;
Washington, 10 F.3d at 1433.  However, in those cases where the
prima facie case consists of no more than the minimum necessary to
create a presumption under McDonnell Douglas, the plaintiff must
produce some evidence of pretext to overcome summary judgment

United States District Court
For the Northern District of California

where the employer has articulated a non-discriminatory reason for the adverse treatment.  Wallis v. J.R. Simplot Co., 26 F.3d 885, 890 (9th Cir. 1994).  When a plaintiff presents direct evidence that the proffered explanation is a pretext for discrimination, "very little evidence" is required to avoid summary judgment.  EEOC v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009).  In contrast, when a plaintiff relies on circumstantial evidence to show pretext, "'that evidence must be specific and substantial to defeat the employer's motion for summary judgment.'"  Id. (quoting Coghlan, 413 F.3d at 1095).

In performing this analysis, the Ninth Circuit has cautioned that district courts should consider a plaintiff's "claim of discrimination with regard to each of these employment decisions separately, examining the specific rationale offered for each decision and determining whether that explanation supported the inference of pretext.'"  Odima v. Westin Tucson Hotel Co., 991 F.2d 595, 600 (9th Cir. 1993) (quoting Norris v. San Francisco, 900 F.2d 1326, 1330 (9th Cir. 1990)).

       1.   Guitron's claims under Title VII and FEHA for discrimination based on her status as a single woman

Defendants argue that Guitron has not established that she is a member of a protected class, because "marital status" cannot be the basis of such a class.  Guitron responds that her status as a single woman is protected under a "sex plus" theory of discrimination.  Under that theory, "Title VII not only forbids discrimination against women in general, but also discrimination against subclasses of women, such as women with pre-school-age children."  Coleman v. B-G Maint. Mgmt., 108 F.3d 1199, 1203 (10th

43

United States District Court
For the Northern District of California

Cir. 1997).  See Rauw v. Glickman, 2001 U.S. Dist. LEXIS 22739, at *25 (D. Or.) ("Although the Ninth Circuit has not specifically addressed the viability of the 'sex plus' claim, it presumably would allow such a claim given the current state of the law.").

However, Guitron nonetheless fails to establish the elements of a prima facie case of discrimination based upon her status as a single woman.  The undisputed evidence establishes that Guitron repeatedly failed to meet her sales goals, and that she was thus not performing her job satisfactorily.[25]  For many of the adverse actions of which she complains,[26] including her negative ratings, asking her to document her requests for schedule modifications, and giving her a hard time when she asked for time off (although consistently allowing her to take the requested time off) and for other actions to which Guitron did not point as the basis for this claim in the 2AC, such as placing her on administrative leave, Guitron also has failed to identify any single men who were treated differently than she was.  "[A]lthough the protected class

_____

[25] In Plaintiffs' opposition, they argue that this was pretextual and that, "as a way to ensure poor sale [sic] performance, Rubio stopped giving Guitron referrals which made it harder for her to meet her sales goals."  Opp. at 10.  In support, Plaintiffs cite pages 245 and 246 of Guitron's deposition testimony contained in Plaintiffs' Exhibit 21.  However, Plaintiffs did not include the cited pages in the exhibit provided to the Court.  See Docket Nos. 82-5, 82-6.  Although Plaintiffs also argue that "Rubio refused to provide Plaintiffs with referrals and other means of support," none of the cited exhibits are related to Guitron.  See Opp. at 4 (citing Pls.' Exs. 18, 19; Klosek Depo. Tr. 207:1-24).

[26] The specific adverse employment actions to which Guitron points for these claims are "setting additional requirements for Guitron, subjecting Guitron to torment and harassment about her private life, giving Guitron poor performance reviews based on her familial obligations and discriminating against Guitron for having to care for her children."  2AC ¶¶ 156, 196.

need not include all women, the plaintiff must still prove that the subclass of women was unfavorably treated as compared to the corresponding subclass of men." Coleman, 108 F.3d at 1203. Further, many of the employment decisions of which Guitron complains do not amount to actionable adverse employment actions, because they did not "materially affect the compensation, terms, conditions, or privileges of . . . employment." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008).

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Guitron's claims for discrimination under Title VII and FEHA.

> 2.   Klosek's FEHA claim for discrimination based on disability status

In the 2AC, Klosek alleges that Defendants discriminated against her based on her disability status when her "position was taken from her while she was on medical leave of absence" and when she was terminated. 2AC ¶ 203.

Defendants argue that Klosek cannot establish a prima facie case because she cannot establish that either of these actions was taken "because of" her disability. See Faust, 150 Cal. App. 4th at 886. Defendants do not challenge her ability to establish the other elements of her prima facie case. See Mot. at 29-30.

In response, Klosek "must come forward with some admissible facts capable of demonstrating a causal nexus" between her disability and these adverse actions. Evans v. Sears Logistics Servs., 2011 U.S. Dist. LEXIS 141145, at *40 (E.D. Cal.). In their opposition, Plaintiffs aver that Defendants have "not moved

United States District Court
For the Northern District of California

45

on the question of causality" and do not address this requirement specifically.  Opp. at 28.

Nevertheless, the Court finds the evidence in the record establishes a prima facie case of discrimination based on disability.  As previously described, while Klosek was on disability leave, on September 9, 2010, Walker sent her a letter stating that Wells Fargo would be posting her position in several days and expected to fill it shortly and asking that Klosek let her know if she planned to return to work soon thereafter. Walker's letter suggested that, if Klosek were able to return to work at that time, she would be able to retain her position. After Klosek informed Walker that she was unable to return because of her medical condition, her position was filled by Sipes. Further, because Wells Fargo filled her position, it also placed her on job search leave, as stated in Walker's letter.  Because she was unable to find a new position during that leave, Wells Fargo terminated her.  However, she would not have been placed on that leave, but for the fact that she could not return to her former position in September 2010 due to her disability.  Thus, the evidence is sufficient to establish a causal nexus between Klosek's disability and Wells Fargo's decisions to fill her position while she was on leave and to terminate her.

Defendants aver that they filled Klosek's position because Wells Fargo had a business need for a Registered Personal Banker Two at the St. Helena branch and could not hold her position open indefinitely.  Defendants also contend that they terminated Klosek because she was unable to find an open position during her

1  ninety-day job search leave.  Defendants further argue that Klosek

2  cannot establish that these reasons were pretextual.

3       However, Klosek has produced evidence sufficient to create a

4  genuine issue of material fact as to whether Defendants' proffered

5  non-discriminatory reasons for these actions were "unworthy of

6  credence."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

7  256 (1981).  The evidence in the record demonstrates that the St.

8  Helena branch had not had a Personal Banker Two for several years

9  prior to the time that Klosek transferred there from the Sonoma

10  branch.  After Klosek had been on leave for about seven months,

11  Wells Fargo transferred Sipes from the Sonoma branch to fill her

12  position.  However, shortly after Klosek's job search leave ended,

13  Defendants transferred Sipes from the St. Helena branch back to

14  the Sonoma branch.  This raises an inference that Defendants

15  transferred Sipes to the St. Helena branch to fill Klosek's former

16  position only long enough for her job search leave to expire.

17  Further, Klosek has offered evidence that Defendants chose not to

18  announce an opening for a Personal Banker Two in the Sonoma

19  branch, even though Alejo, the manager at that branch, testified

20  that he had a need for one during the time period that Klosek was

21  searching for such a position.

22       Thus, the Court DENIES Defendants' motion for summary

23  judgment on Klosek's claims for disability discrimination under

24  the FEHA.

25  III. Failure to prevent discriminatory practices in violation of
        Title VII and FEHA

26

27       Defendants contend that summary judgment should be granted on

28  Plaintiffs' claims for failure to prevent discriminatory practices

47

**United States District Court**
For the Northern District of California

1  in violation of Title VII and FEHA, because the underlying

2  discrimination claims fail.  Plaintiffs argue the converse.

3      Because Defendants' motion for summary judgment on Guitron's

4  discrimination claims and Klosek's discrimination claim under

5  Title VII is granted, the Court GRANTS Defendants' motion for

6  summary judgment on Guitron's claims for failure to prevent

7  discriminatory practices under Title VII and FEHA and Klosek's

8  corresponding claim under Title VII.  Because their motion for

9  summary judgment is denied as to Klosek's claim for age and

10  disability discrimination under FEHA, the Court DENIES Defendants'

11  motion for summary judgment on Klosek's FEHA claim for failure to

12  prevent discriminatory practices.

13  IV.  Retaliation in violation of Title VII and FEHA

14      Claims for retaliation under Title VII and FEHA are analyzed

15  under the McDonnell Douglas framework outlined above.  Lam v.

16  University of Hawaii, 40 F.3d 1551, 1559 n.11 (9th Cir. 1994);

17  Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005).  To

18  establish a prima facie case of retaliation, a plaintiff must

19  "show (1) he or she engaged in a 'protected activity,' (2) the

20  employer subjected the employee to an adverse employment action,

21  and (3) a causal link existed between the protected activity and

22  the employer's action."  Yanowitz, 36 Cal. 4th at 1042; accord

23  Miller v. Fairchild Indus., Inc., 797 F.2d 727, 731 (9th Cir.

24  1986).

25          A.  Guitron's claims for retaliation under Title VII and
              FEHA

26  In Plaintiffs' opposition, they contend that the relevant

27  protected activity for Guitron's claims was her "refusal to

28

48

United States District Court
For the Northern District of California

conform to the constant pressure to use her sex appeal to elicit" daily sales credits.  Opp. at 30.  They also allege that "Rubio was well aware" that Guitron refused to do this and that "Rubio was the same person that denied Guitron referrals because she would not flirt with customers."  Id. at 31.

However, Plaintiffs' allegations are not supported by evidence in the record.  The comments that Guitron points to were made by Isook Park and Chris Jensen, and Plaintiffs offered no evidence that Rubio knew about them or knew that Guitron refused to engage in these behaviors.  Similarly, as discussed above, Guitron has offered no evidence that Rubio denied her referrals because Guitron did not flirt with customers.

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Guitron's claims for retaliation under Title VII and FEHA.

B. Klosek's claims for retaliation under Title VII and FEHA

In the 2AC, Klosek alleges that she engaged in protected activity by making reports of improper, unlawful, discriminatory and harassing conduct of Rubio, Zavaleta and others, and that, as a result, she was retaliated against by being given negative performance evaluations and placed on unwarranted administrative leave.  2AC ¶¶ 174-76, 216-19.

Defendants argue that Klosek presents no evidence of a causal connection between any protected activity and the purportedly adverse employment actions.

In response, Klosek points to three exhibits supporting that she engaged in protected activity that was causally related to

**United States District Court**
For the Northern District of California

adverse employment actions.[27]  However, these exhibits do not

support such a finding.  First, in her declaration, Klosek attests

that the "poor performance reviews and disciplinary actions for

missing [sales] goals" she received were caused by her "refusal to

partake in unethical and fraudulent behavior and inability to meet

my goals following proper procedure."  Klosek Decl. ¶ 10.  This

alleged activity underlies her failed SOX claim, and does not

constitute protected activity under FEHA or Title VII.

Second, Klosek cites her complaints to Brandenburg in April

2009 about Alejo and her coworkers in the Sonoma branch.  Many of

her allegations in those complaints were based on her feeling that

certain coworkers acted like they "owned" their customers and

refused to work as a team, and that Alejo displayed favoritism to

particular employees.  These complaints also do not constitute

protected activity under FEHA or Title VII.  Similarly, although

Klosek complained that Alejo treated her differently after she

returned from a sick leave and that he became mad at her when she

called about a "medical emergency,"[28] Klosek did not allege that

she had a physical disability or medical condition as defined by

---

[27] In Plaintiffs' opposition brief, although they refer to
Klosek, they cite paragraph thirteen of Guitron's declaration and
an exhibit related to that paragraph.  See Opp. at 31 (citing
Guitron Decl. ¶ 13; Pls.' Ex. 60).  It appears that Plaintiffs
meant instead to cite the corresponding paragraph in Klosek's
declaration and the exhibit related to that paragraph.  See Klosek
Decl. ¶ 13; Pls.' Ex. 77.

[28] There is no evidence in the record regarding the reason
that Klosek took sick leave or was hospitalized while she worked
at the Sonoma branch between 2008 and 2009.  As previously noted,
Klosek took a medical leave due to stress in 2010 and was
diagnosed with cancer while on that leave.

United States District Court
For the Northern District of California

FEHA at that time or that Alejo discriminated against her based on one. Further, although Klosek complained that Cervantes preferred to work with younger women and refused to work with her, Klosek does not point to an adverse employment action that Cervantes took against her or participated in, or any reason that others may have retaliated against her for complaints against Cervantes. Finally, even if such complaints did constitute protected activity, Klosek relies only on temporal proximity to establish causation between these complaints and the performance reviews that Alejo gave for her. However, Alejo submitted his performance reviews approximately nine months after Klosek made these complaints and approximately seven months after Brandenburg completed her investigation, during which she interviewed Alejo about Klosek's accusations. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam) (noting that a court may not infer causation from temporal proximity unless the time between an employer's knowledge of protected activity and an adverse employment action is "very close" and citing cases for the proposition that a three-month and four-month time lapse is too long to infer causation).

Klosek also offers no evidence that the performance review completed by Rubio or the administrative leave imposed by Walker were causally connected to any activity protected by Title VII and FEHA. As noted above, Klosek's claims of unethical behavior by others were not activity protected by Title VII and FEHA. Klosek has offered no evidence that she complained about Rubio's comment that she was "too old for banking," question about her plans for

retirement or recommendation of the book, "Bridging the Age

Generation Gap," before these actions were taken.

Accordingly, the Court GRANTS Defendants' motion for summary

judgment as to Klosek's claims for retaliation under Title VII and

FEHA.

V.   Wrongful discharge in violation of public policy

Under California law, an employee may maintain a tort cause

of action against his or her employer when the employer's

discharge of the employee contravenes fundamental public policy.

Foley v. Interactive Data Corp., 47 Cal. 3d 654, 666 (1988).  Such

claims are often referred to as Tameny claims, after the decision

in Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167, 176-177

(1980).  A claim for wrongful termination in violation of public

policy must be based on a fundamental policy established by a

constitutional, statutory or regulatory provision.  Green v. Ralee

Eng'g Co., 19 Cal. 4th 66, 76, 90 (1998).

A.   Guitron's wrongful discharge claim

Defendants argue that Guitron cannot establish a Tameny

claim, because her "employment ended only when she abandoned her

job" on February 11, 2010.  Mot. at 11.  Defendants further

contend, "Termination for job abandonment is not violative of any

public policy."  Arn v. News Media Group, 2004 U.S. Dist. LEXIS

31324, at *23 (E.D. Cal.).

Guitron responds that she was fired on January 27, 2010 when

Rubio told her to turn over her keys and leave for being

insubordinate and then had her escorted off the premises.  Opp. at

21-22, 32.  Guitron relies on cases that have held, "No set words

are necessary to constitute a discharge; words or conduct, which

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

would logically lead an employee to believe his tenure had been terminated, are in themselves sufficient." <u>NLRB v. Cement Masons Local No. 555</u>, 225 F.2d 168, 172 (9th Cir. 1955).  However, based on her own testimony, Guitron could not have reasonably believed that she was terminated, particularly in light of the repeated statements to the contrary made by Walker.

Because Guitron was terminated only when she voluntarily abandoned her job on February 11, 2010, after being warned by Walker that failure to appear for work would result in termination, she cannot maintain a claim for wrongful termination. Further, the Court has already concluded that Guitron has failed to establish a prima facie case of discrimination or retaliation that would violate the public policy expressed in SOX, Title VII or FEHA.  Accordingly, Defendants' motion for summary judgment on her wrongful termination claim is GRANTED.

B.   Klosek's wrongful discharge claim

Klosek contends that she was wrongfully terminated when Defendants filled her position while she was on medical leave and did not offer her an alternative position when she was able to return to work.  In the 2AC, Klosek alleges that she was terminated because she complained about unethical and unlawful banking practices and because of her medical conditions.  2AC ¶ 150.

To the extent that Klosek bases this claim on her complaints about "unethical and unlawful banking practices," the Court has already concluded that there is no material dispute that Klosek did not engage in activity protected under SOX, and thus Klosek's claim for wrongful termination based on the public policy

United States District Court
For the Northern District of California

expressed in SOX also fails.  Accordingly, Defendants' motion for summary judgment is GRANTED insofar as Klosek rests her claim on this activity.

However, the Court has concluded that Klosek established a prima facie case of discrimination under FEHA based on disability status and has raised a disputed issue of material fact as to whether Defendants' reasons for her termination were pretextual. Thus, Defendants' motion for summary judgment is DENIED on Klosek's wrongful termination claim to the extent it alleges termination in violation of the public policy of preventing disability discrimination as expressed in the FEHA.

VI.  Harassment in violation of FEHA

In the 2AC, Guitron alleges that Rubio created a hostile work environment and harassed her based on her status as a single woman and mother.  Klosek brings a similar claim against Rubio on the basis of her age.  Both Plaintiffs bring their harassment claims against Rubio only.

A.  Guitron's claim of harassment based on her status as a single woman and mother

"California courts have adopted the same standard [applied under Title VII] for hostile work environment sexual harassment claims under the FEHA."  Lyle v. Warner Bros. Television Prods., 38 Cal. 4th 264, 279 (2006).  Accordingly, to prevail on her claim, Guitron must establish that "she was subjected to sexual advances, conduct, or comments that were (1) unwelcome, (2) because of sex, and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment."  Id. (internal citations omitted).  "Past California

decisions have established that the prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex." Miller v. Department of Corrections, 36 Cal. 4th 446, 461 (2005). "With respect to the pervasiveness of harassment, courts have held an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature." Lyle, 38 Cal. 4th at 283.

Defendants characterize Guitron's claim as alleging that Rubio harassed her on the basis of her marital status. However, as noted above, Guitron's claim against Rubio is based, not on her marital status alone, but rather upon her "sex plus" her marital status. See Opp. at 32 (arguing that "Rubio harassed her because of her status as a single woman").

Defendants also contend that Guitron misrepresents the contents of her exhibits and that she cannot establish sufficiently severe or pervasive sexual harassment attributable to Rubio based on the actual evidence in the record. While, in her opposition, Guitron points to what she characterizes as "ample evidence" of Rubio's conduct directed at her, much of the cited evidence relates to comments or actions made toward people other than Guitron, by people other than Rubio or before Guitron began working for Wells Fargo. See, e.g., Metelin Decl. ¶ 5(f) (allegedly sexist comments made by Park and Hernandez); Guitron

Depo. Tr. 333:17-334:1 (allegedly sexist comments made by Park and Jensen); Mendez Depo. Tr. 128:18-129:9 (allegedly sexist comments made by Rubio through January 2007); Franco Depo. Tr. 87:7-88:23 (same). Guitron offers no authority that the behavior of other staff people should be attributable to Rubio, or that comments Rubio made before Guitron began working at the branch and that Guitron did not witness can establish the existence of a hostile work environment during the time that she did work for Rubio. See Lyle, 38 Cal. 4th at 285 ("the plaintiff generally must show that the harassment directed at others was in her immediate work environment, and that she personally witnessed it"). Guitron also offers no evidence that Rubio refused to give her referrals because Guitron refused to "shake her skirt." Similarly, although Guitron states in her declaration that she was told on multiple occasions by "Branch management" to unbutton her shirt to get more sales, she does not specify which of the several managers at the branch made these comments, despite the fact that this was within her knowledge. Guitron Decl. ¶ 6.

The single allegation for which Guitron provides evidentiary support is that Rubio once sent her a text message asking permission to open a package that Guitron had received from a customer, whom Rubio called "an admirer," and that Rubio asked who the package was from. Guitron Depo., Tr. 333:10-16. This is not sufficiently severe or pervasive to create an abusive work environment or to support a harassment claim.

Accordingly, Defendants' motion for summary judgment as to Guitron's harassment claim against Rubio is GRANTED.

United States District Court
For the Northern District of California

B.   Klosek's claim of harassment based on her age

Defendants argue that Klosek cannot establish that Rubio's alleged age-related comments to her constituted severe or pervasive harassment, because Klosek alleged that Rubio made only three such comments.  Klosek responds that Defendants' count is incorrect.  However, the evidence that Klosek cites in support of her argument is comprised of three comments made by Rubio.  The other comments or actions cited are by people other than Rubio.  See Opp. at 34 (citing Klosek Depo. Tr. 181:3-12 (alleging that Jensen failed to give Klosek referrals); 239:6-240:4 (discussing comments made by Alejo)).

Defendants also contend that the other conduct of which Klosek complains amounts to personnel management activity, which as a matter of law cannot support a claim of harassment, and can only support a discrimination claim.

"Personnel management action must be analyzed in the context of discrimination as opposed to harassment."  Hardin v. Wal-Mart Stores, Inc., 2012 U.S. Dist. LEXIS 28002, at *68 (E.D. Cal.) (citing Lewis v. UPS, Inc., 252 Fed. App'x. 806, 808 (9th Cir. 2007)).  "However, some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message if done in an unnecessarily demeaning manner."  Id. (internal quotations omitted); see also Roby v. McKesson Corp., 47 Cal. 4th 686, 709 n.10 (2009) (giving as examples "shunning of Roby during staff meetings, Schoener's belittling of Roby's job, and Schoener's reprimands of Roby in front of Roby's coworkers").  Klosek cites

**United States District Court**
For the Northern District of California

1   no evidence that Rubio's supposed failure to provide support or

2   adequate referrals was done in an unnecessarily demeaning manner.

3       Thus, viewed in the light most favorable to Klosek, the

4   harassment evidence consists of Rubio's three age-related

5   comments to Klosek.  First, in October or November 2009, Rubio,

6   who was fifty-five years old, told Klosek, who was in her mid-

7   sixties, "You're too old for banking," and that she had noticed

8   her date of birth when she reviewed her file.  Klosek Depo., Tr.

9   168:7-169:1; Rubio Decl. ¶ 3.  Then, in November 2009, Rubio asked

10  Klosek "if [she] was going to stay at the branch, did [she] have

11  any plans of retiring" and "when."  Klosek Depo., Tr. 237:22-

12  238:8.  Finally, in November or December 2009, Rubio told Klosek

13  that she should read a book entitled "Bridging the Age Generation

14  Gap."  Id. at 233:13-234:4.

15      "To prevail on an age-based hostile workplace/harassment

16  claim, [a plaintiff] must show that she was subjected to verbal or

17  physical conduct of an age-related nature, that the conduct was

18  unwelcome, and that the conduct was sufficiently severe or

19  pervasive to alter the conditions of her employment and create an

20  abusive work environment."  Cozzi v. County of Marin, 787 F. Supp.

21  2d 1047, 1069 (N.D. Cal. 2011).  As with sex harassment claims, to

22  be pervasive, the offensive conduct must consist of "more than a

23  few isolated incidents."  Lyle, 38 Cal. 4th at 284.  See also

24  Cozzi, 787 F. Supp. 2d at 1072 ("The 'severe or pervasive'

25  standard excludes occasional, sporadic, isolated, or trivial

26  incidents of verbal abuse.).  This conduct instead must amount to

27  a "concerted pattern of harassment of a repeated, routine and

28  generalized nature."  Aguilar v. Avis Rent A Car System, 21 Cal.

4th 121, 131 (1999).  "The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended."  Beyda v. City of Los Angeles, 65 Cal. App. 4th 511, 517 (1998) (internal quotations and citations omitted).

None of the comments purportedly made by Rubio, nor the combination of them, rises to the level of egregious conduct that would "alter the conditions of employment" or "create an abusive work environment."  See Vasquez v. County of Los Angeles, 349 F.3d 634, 643 (9th Cir. 2003) (finding no hostile work environment in case involving statements that plaintiff had "a typical Hispanic macho attitude" and should consider transferring to the field because "Hispanics do good in the field").  Accordingly, the Court GRANTS Defendants' motion for summary judgment on Klosek's harassment claim against Rubio.

VII. Failure to provide reasonable accommodation or to engage in an interactive process in violation of FEHA

The FEHA provides a cause of action for failure to accommodate a disability or medical condition.  Cal. Govt. Code § 12940(k).  See also Cal. Govt. Code § 12926(i) (defining "medical condition" to include, "Any health impairment related to or associated with a diagnosis of cancer or a record or history of cancer").  "[A]ssuming the employee is disabled, the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's

United States District Court
For the Northern District of California

organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." <u>Jensen v. Wells Fargo Bank</u>, 85 Cal. App. 4th 245, 263 (2000).

"Under FEHA, an employer must engage in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability." <u>Wysinger v. Automobile Club of Southern California</u>, 157 Cal. App. 4th 413, 424 (2007). Failure to engage in this process is a separate FEHA violation independent of an employer's failure to provide a reasonable disability accommodation, which is also a FEHA violation. <u>Id.</u>

In the 2AC, Klosek asserts that Wells Fargo breached its duty to accommodate her disability by failing to keep her position open when she was on medical leave and refusing to return her to that position or to any other when she returned from that leave. Klosek also alleges that Wells Fargo failed to engage in good faith in a meaningful interactive process regarding these accommodations, by failing to help her find a different position within Wells Fargo.

Defendants contend that Wells Fargo provided Klosek with reasonable accommodations by giving her a ten month medical leave. Defendants argue that it was not obliged to keep her position open indefinitely after she acknowledged that there was no "definite timeline" for her recovery, because it had a business need to fill

**United States District Court**
For the Northern District of California

her position.  However, the Court has already concluded that there is a genuine issue of material fact as to whether Wells Fargo in fact had such a business need.  Further, while Klosek extended her leave, she did not seek to do so indefinitely, as Defendants suggest.  There is a genuine question of material fact as to whether, at the time that Wells Fargo filled her position and did not offer her an alternative position, it appeared unlikely that Klosek would be able to return to her position at some point in the foreseeable future.  See, e.g., Hanson v. Lucky Stores, Inc., 74 Cal. App. 4th 215, 226-27 (1999).

Defendants do not claim that Wells Fargo engaged in a good faith interactive process or offered Klosek reasonable accommodations when she was able to return to work, but rather maintain that, at that point, because Klosek was medically cleared to return to work without restrictions, she no longer needed accommodation to perform the essential functions of her job, and she no longer had a statutory entitlement either to a good faith interactive process or reasonable accommodation.  Defendants' argument is essentially that Klosek did not need accommodation at the moment that she was well enough to return to work, and therefore Wells Fargo's obligation to help her return immediately ceased.

Holding a job open for Klosek or identifying a replacement position upon her return would have been a reasonable accommodation for her need for cancer treatment.  See, e.g., Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 263 (2000) ("Holding a job open for a disabled employee who needs time to recuperate or heal is in itself a form of reasonable accommodation

**United States District Court**
For the Northern District of California

and may be all that is required where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future."). To find that an employer no longer has an obligation to follow through on such an accommodation once an employee has recuperated enough to return to work would render it meaningless.

There is a genuine material dispute as to whether Defendants offered Klosek meaningful accommodations or engaged in a good faith interactive process. Klosek has offered evidence that Defendants did not attempt to find her an alternative position. As previously discussed, Klosek has offered evidence that the Sonoma branch had a need for a Personal Banker Two during the time period that Klosek was searching for a position and Defendants chose not to announce the opening.

Accordingly, Defendants' motion for summary judgment on this claim is DENIED.

                                CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART (Docket No. 74).

Wells Fargo is granted summary judgment as to all claims brought by Guitron. Wells Fargo also is granted summary judgment as to Klosek's claims for retaliation in violation of SOX, Title VII and FEHA, wrongful discharge resulting from her complaints about unethical and unlawful banking practices, age discrimination under Title VII and failure to prevent discriminatory practices in violation of Title VII. Further, Rubio is granted summary

judgment on all claims brought against her individually by both Plaintiffs.

The Court denies summary judgment on Klosek's claims for age and disability discrimination under FEHA, wrongful discharge based on disability, failure to prevent discriminatory practices in violation of FEHA and failure to accommodate and to engage in an interactive process in violation of FEHA.

Because the Court grants summary judgment as to all claims brought by Guitron, Defendants' motion to sever the claims of Guitron and Klosek is DENIED as moot (Docket No. 64).

A case management conference will be held on Wednesday, August 8, 2012 at 2:00 p.m.  Klosek and Wells Fargo shall file a joint case management conference statement one week before the conference.

IT IS SO ORDERED.

Dated: July 6, 2012

CLAUDIA WILKEN
United States District Judge